2015 VT 49

# In re Application of Lathrop Limited Partnership I

# In re Application of Lathrop Limited Partnership II

# In re Application of Lathrop Limited Partnership III

[121 A.3d 630]

Nos. 13-444, 13-445 & 13-446

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morse, J. (Ret.), Specially Assigned

Opinion Filed March 20, 2015

20

22

*William A. Nelson*, Middlebury, and *James A. Dumont* of *Law Office of James A. Dumont, PC*, Bristol, for Appellants.

*Mark G. Hall* of *Paul Frank + Collins P.C.*, Burlington, for Appellee.

*William H. Sorrell*, Attorney General, and *Robert F. McDougall*, Assistant Attorney General, Montpelier, for Amicus Curiae Vermont Natural Resources Board.

¶ 1. **Dooley, J.** This appeal arises from a decision of the Superior Court, Environmental Division in three consolidated dockets, all of which carved a very long and circuitous path

through the lower tribunals before reaching this Court. The subject of these dockets is the proposal of Lathrop Limited Partnership ("Lathrop") to establish a sand and gravel extraction operation on a parcel of land in the Town of Bristol, Vermont. Neighbors of the project appeal the environmental court's decision to approve Lathrop's conditional use and Act 250 permit applications, and raise six claims of error. They argue that the court erred in: (1) holding that sand and gravel extraction is permitted as a conditional use in the Town's Rural Agricultural (RA-2) and Mixed Use (MIX) zoning districts; (2) holding that the operation will not create a pit within the meaning of § 526(2) of the Town's zoning bylaws; (3) concluding that the court could review Lathrop's 2012 permit application de novo, without regard to the 2004 permit, and that the successive-application doctrine does not apply; (4) relying on one-hour average noise levels and ignoring uncontested evidence of large increases in the number of high-decibel noise events in determining impact of traffic on neighbors; (5) admitting and relying on acoustical-modeling software for predicting noise levels emitted by the project; and (6) concluding that it had jurisdiction to review Lathrop's amended Act 250 permit application without a remand. We affirm the environmental court's holdings that sand and gravel extraction is permitted as a conditional use in the RA-2 and MIX districts and that the acoustical-modeling testimony is admissible. We reverse its holdings with respect to the creation of a pit under § 526(2), the successive-application doctrine, the impact of traffic noise on neighbors, and its jurisdiction to review Lathrop's amended Act 250 permit application.

¶ 2. We start with the factual and procedural background. The three environmental court dockets, *Lathrop I*, No. 122-7-04, *Lathrop II*, No. 210-9-08, and *Lathrop III*, No. 136-8-10, are addressed in turn below. Much of the detailed description of the proposals and administrative and environmental court actions is set forth in the attached Appendix.

*Lathrop I*

¶ 3. In 2003,[1] Lathrop applied for a permit from the Town of Bristol's Zoning Board of Adjustment (ZBA) for a proposed sand

---

[1] The initial application was submitted in July 2003 but was amended in January 2004. For the purposes of this decision, we refer to this as the 2003 application,

and gravel extraction operation on a sixty-five acre parcel located on South Street, Rounds Road, and Bristol Notch Road in the Town's RA-2 and MIX zoning districts. Lathrop proposed to extract up to 60,000 cubic yards of material per year, resulting in an average of seventeen truckloads each day over 250 days of operation. As proposed, the extraction would take place exclusively within the RA-2 district, with an access road to the pit from South Street at the northern edge of the parcel. The access road would pass through the MIX district, where it would cross over a preexisting, but abandoned, nonconforming gravel pit. At its July 2004 hearing, the ZBA voted to consider the application under § 526 of the Town of Bristol Zoning Bylaws & Regulations (2003) [hereinafter Bylaws], which provides, in pertinent part, that "in any district the removal of sand and gravel for sale . . . shall be permitted only after conditional use review and approval by the Board of Adjustment." In reviewing the application, the ZBA found no fewer than nine other gravel pits in the Town, at least three of which were also located in the RA-2 district. The ZBA also considered the character of the area; the noise levels associated with the project; possible increases in truck traffic along public highways; impact on historic and natural sites; impact on the Town's water supply; and Lathrop's proposals for a reclamation plan, erosion control, and other related issues.

¶ 4. The ZBA also addressed the nine criteria listed in § 526, to which all projects must conform. Specifically, the ZBA determined that, pursuant to provision (8), the project would not constitute an extension of an existing nonconforming operation; and, pursuant to provision (2), the project would not create a pit within the meaning of § 526 because a pit must have "vertical sides" or "an almost perpendicular slope or pitch." The ZBA ultimately approved the application with twenty-three additional conditions, which included, among other things, limits on days and hours of operation, scope of extraction, decibel levels, and daily truck trips; mitigation with respect to noise, dust, traffic, and aesthetics; and requirements for access road construction, reclamation, and reporting and recordkeeping. The conditions, which are set forth in greater detail in the Appendix, have become a central focus of this appeal.

---

although the relevant details of the proposal are reflected in the 2004 amended application.

¶ 5. Neighbors appealed the ZBA's decision to the environmental court. The parties filed cross-motions for summary judgment, which the court addressed in *In re Rueger*, No. 122-7-04 Vtec, slip op. (Vt. Envtl. Ct. May 5, 2005), https://www.vermontjudiciary.org/ GTC/Environmental/Opinions.aspx, and again in a supplemental decision and order dated June 23, 2005. The court held that the ZBA properly reviewed Lathrop's application under § 526 of the Bylaws and that the access road across the discontinued gravel pit would not constitute an extension of a nonconforming operation. The court found, however, that material facts remained in dispute as to whether, and under what conditions, the proposed sand and gravel operation should be granted a conditional use permit. The parties initially prepared for trial on the remaining issues, but then requested that the court place the appeal on inactive status while Lathrop sought additional permits for the project. This appeal has been termed *Lathrop I*.

## Lathrop II

¶ 6. In 2007, Lathrop submitted a second application to the ZBA for the sand and gravel extraction operation, partly in response to concerns and criticisms about the original proposal. At its September 2008 hearing, the ZBA determined that the new application differed substantially from the original application approved in 2004, citing the changed access point to Rounds Road at the southern end of the parcel, altered phasing scheme for the development, and addition of plantings for screening purposes. The ZBA noted that "no provision of the [Bylaws] prohibits filing an application for a zoning permit that differs substantially from a permit previously granted and that remains undeveloped." Additionally, Lathrop's second application presented extended hours of operation, an increase in the scope of extraction and average daily truck trips, higher decibel levels at property boundaries, and a narrower road bed for the access road. Although the ZBA found that the second application satisfied nearly all the conditional use requirements, it ultimately denied the permit for Lathrop's failure to submit a plan for refilling the resulting pit, as required under § 526(2).

¶ 7. Lathrop appealed the ZBA's denial of its 2007 application to the environmental court. Several neighbors filed a motion to dismiss on various grounds, including that the application was not ripe for review and that it asked for an advisory opinion. They

primarily argued that the new proposal was a successive application that did not meet the requirements of the successive-application doctrine. The court denied neighbors' motion, holding in pertinent part that the successive-application doctrine does not govern because the second application was not a revised proposal submitted as a consequence of the ZBA denying the original application. Neighbors then moved for summary judgment on the issue of whether the project will create a pit within the meaning of the Bylaws. The Town submitted a memorandum in support of neighbors' motion for summary judgment, concurring with their argument that Lathrop's operation will create a pit and also asserting that Lathrop failed to present its plan for a berm removal to the ZBA and therefore should be barred from doing so on appeal. In *In re Lathrop Limited Partnership II*, No. 210-9-08 Vtec, slip op. (Vt. Envtl. Ct. Aug. 14, 2009), https://www.vermont judiciary.org/GTC/Environmental/Opinions.aspx, the court denied neighbors' motion for summary judgment, reasoning that the question of whether the reclaimed extraction area is a pit under § 526(2) is highly fact-specific. *Id.* at 3. The court also concluded that its de novo review allows it to consider project revisions so long as the revisions do not require a new application. The parties then requested to stay this and the *Lathrop I* appeals pending completion of the Act 250 proceedings.

### Lathrop III.

¶ 8. In 2006, Lathrop filed its first Act 250 permit application with the District No. 9 Environmental Commission, while the environmental court was considering *Lathrop I.* In the 2006 application, Lathrop requested that the district commission consider only whether the project conforms with the Bristol Town Plan — more specifically, whether the town plan prohibits sand and gravel extraction in the MIX and RA-2 districts. The district commission concluded that the project conflicted with the town plan, specifically because the plan prohibits the creation of pits, and denied the application. Lathrop appealed to the environmental court. After a series of motions from the parties, the court

granted Lathrop's motion to remand the application to the district commission for consideration under all relevant Act 250 criteria.[2]

¶ 9. In July 2010, on remand, the district commission found that Lathrop's application conformed with Criteria 1 (air pollution), 1(B) (waste disposal), 1(G) (impact on wetlands), 2 (sufficiency of water supply for dust suppression), 3 (potential impact on neighboring wells), 8(A) (impact on wildlife), 9(A) (impact of growth), 9(B) (impact upon primary agricultural soils), 9(C) (impacts on forests and secondary agricultural soils), and 9(L) (rural growth areas). The district commission also found that Lathrop failed to submit evidence sufficient to carry its burden with respect to Criteria 8 (aesthetics, noise, visual impacts, odors), 5 and 9(K) (transportation and pedestrian safety, public investment), 9(E) (impacts from pit operations, sufficiency of reclamation plan, blasting impacts), and 10 (town and regional plan). Lathrop appealed to the environmental court the district commission's determination on Criteria 5, 8, 9(E), 9(K), and 10 and moved to consolidate the three dockets. The court granted Lathrop's motion to consolidate and moved *Lathrop I* and *Lathrop II* out of inactive status.

### Consolidated Appeal

¶ 10. The three consolidated dockets proceeded to trial in the environmental court. Prior to trial, neighbors filed several motions. The court addressed three of these motions, all relevant to this appeal, in a 2011 order. First, the court denied neighbors' motion to exclude evidence of the berm removal, concluding that the proposal was merely a minor application revision allowable under the court's de novo review. Second, the court denied neighbors' motion for partial summary judgment on the issue of Lathrop's conflicting permit applications. Neighbors argued that Lathrop should be prohibited from presenting a second application after its first application already was approved conditionally by the ZBA. The court concluded that nothing prevents applicants from submitting conflicting proposals for the same project and stated that "[t]he only restriction to submitting another application arises after a permit application has been denied: in that instance, an

---

[2] Lathrop's first appeal to the environmental court of its Act 250 permit application, Docket No. 64-3-06 Vtec, was closed upon remand to the district commission. That docket is not part of this consolidated appeal.

applicant is prohibited from submitting an application that is substantially similar to the one that was denied." Finally, the court denied neighbors' motion to reconsider its 2009 decision under *Lathrop II*, where it denied summary judgment on the issue of whether § 526 allows sand and gravel extraction in the RA-2 and MIX districts, because neighbors' motion was filed beyond the ten-day limit specified in Vermont Rule for Environmental Court Proceedings 5(b) and neighbors did not submit any new information or argument that would justify reconsideration.

¶ 11. Neighbors also moved for the court to rule as inadmissible testimony based on acoustical modeling from Lathrop's expert witness on noise impacts, arguing that it violated Vermont Rule of Evidence 702 and the standard for admissibility of expert testimony, as outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court decided to allow the testimony at trial and make a post-trial determination as to whether it should remain part of the record. The court ultimately denied neighbors' motion and admitted the testimony. We address this issue in the merits below.

¶ 12. The environmental court considered several issues preserved by the parties on each of the three dockets. As relevant to this appeal, it held that § 526 of the Bylaws permits sand and gravel extraction operations in the RA-2 and MIX districts; Lathrop's project will not create a pit within the meaning of § 526(2); and Lathrop's application adequately addresses impacts from noise, as required under both the Town's Bylaws and the Act 250 criteria. Neighbors appealed. With regard to the noise impacts, neighbors specifically appeal the court's reliance on one-hour average noise levels to determine impacts and the court's decision to admit evidence based on acoustical modeling. In addition to these three issues, neighbors also appeal the court's decision to review Lathrop's conflicting conditional use applications and the change in access point from Rounds Road to South Street, which Lathrop presented for the first time at trial.

I.

¶ 13. The first issue, and a threshold matter, is whether the Bylaws allow sand and gravel extraction in the RA-2 and MIX districts. Before proceeding to the parties' arguments, we set forth the relevant Bylaws. The primary Bylaw at issue is § 526, which regulates the extraction of soil, sand, and gravel. Section 526 states, in pertinent part:

> In accordance with [24 V.S.A. § 4407(8)], in any district the removal of sand or gravel for sale, except when incidental to construction of a structure on the same premises, shall be permitted only after conditional use review and approval by the Board of Adjustment.

Bylaws § 526.[3] The Bylaw goes on to require conformity with nine specific conditions and to allow for the attachment of additional conditions as the ZBA deems necessary to protect the safety and general welfare of the public. Additional criteria for conditional use review are laid out in § 341, including requirements that the proposed uses shall not result in an undue adverse effect on community facilities, the character of the area, traffic, and other bylaws and ordinances in effect.

¶ 14. ■ Sand and gravel extraction is considered "quarrying" in § 130, the definition section of the Bylaws. Quarrying, in turn, is listed as a form of "heavy manufacturing or industry," which is defined as "[t]he processing, assembly, distribution, or packaging of natural or man-made products where such activity results in substantial off-site impacts or all such activity and storage of raw or finished products is not enclosed inside a building or screened from the abutting properties and public rights-of-way." *Id.* § 130. Conversely, "light manufacturing or industry" encompasses activities that do not result in substantial off-site impacts and are enclosed inside a building or otherwise screened from adjacent properties and rights-of-way. *Id.*

¶ 15. ■ Sections 1000 through 1013 provide specific regulations for each individual district, including a statement of objectives and guidelines and an itemized list of permitted uses. No district expressly permits sand and gravel extraction or any form of quarrying as either an authorized or conditional use. Although several districts permit as a conditional use "light manufacturing," only one district, the Commercial District (C-1), § 1005, broadly permits "industrial use," which can be interpreted to encompass both heavy and light manufacturing. Similarly, no district expressly prohibits sand and gravel extraction or quarrying in its statement of objectives and guidelines.

---

[3] The statutory section referenced in the Bylaw, 24 V.S.A. § 4407(8), was repealed in 2005. It provided that a municipality may adopt regulations for sand, gravel, and soil removal requiring applicants to submit an acceptable rehabilitation plan and post bond to assure rehabilitation. *Id.*

¶ 16. With respect to the RA-2, § 1002, and MIX, § 1012, districts, neither lists as by-right or conditional uses sand and gravel extraction, quarrying, heavy manufacturing, or industry. The RA-2 district does not permit light manufacturing and, as noted in the statement of objectives, "is intended to be primarily residential in character." *Id.* § 1002. The MIX district does permit light manufacturing as a conditional use, but expressly prohibits heavy manufacturing in its statement of objectives. *Id.* § 1012.

¶ 17. In addition to the district-by-district enumeration of permitted uses, § 546 provides a blanket restriction on several specific uses within certain zoning districts, including the MIX district. Within this list of prohibited uses is "unenclosed manufacturing or processing of goods or materials," which aligns with the definition of "heavy manufacturing." *Id.* § 546. The Bylaw does not specifically list "quarrying" or "sand and gravel extraction."

¶ 18. With this regulatory background in mind, we turn to the parties' arguments and interpretations of the Bylaws. Neighbors argue that the ZBA's and environmental court's interpretation allowing sand and gravel extraction in any zoning district creates internal inconsistencies within the Bylaws — that is, § 526 would expressly allow sand and gravel extraction while other Bylaws prohibit this use. They reason that because sand and gravel extraction is defined as a form of quarrying, which in turn is defined as heavy manufacturing — and heavy manufacturing is prohibited in virtually all districts — sand and gravel extraction must be prohibited in these same districts. Specifically, they argue that because neither the RA-2 nor the MIX district expressly allows heavy manufacturing, sand and gravel extraction must be prohibited in these districts. Under neighbors' theory, we should read § 526 to mean that "in any district *zoned to allow it* the removal of sand or gravel for sale . . . shall be permitted only after conditional use review and approval by the Board of Adjustment." This, according to neighbors, is the only reading that will not produce absurd results.

¶ 19. Lathrop, on the other hand, urges us to look at the plain language of § 526, which, it contends, expressly allows sand and gravel extraction in all districts, subject only to conditional use approval. Lathrop's theory is that because no other provision expressly prohibits *sand and gravel extraction*, but merely heavy industry or unenclosed manufacturing, the more specific language of § 526 should trump the more general language found in the

other Bylaws. Lathrop also argues that any ambiguity should be resolved in favor of the landowner and that because the ZBA twice stated that § 526 allows sand and gravel extraction we should sustain its interpretation. Both the ZBA and the environmental court agreed with Lathrop and concluded that § 526 of the Bylaws allows sand and gravel operations in *any district*, including the RA-2 and MIX districts, subject only to conditional use review.

¶ 20. The fundamental difference between the two interpretations advanced by the parties is that neighbors' reading creates a *necessary* condition, while Lathrop's reading, and the reading adopted by the ZBA and environmental court, creates a *sufficient* condition. The ambiguous phrase at issue in § 526 is "in any district." Neighbors' theory asks that we read "in any district" to mean *in any district where sand and gravel extraction is permitted*. Thus, meeting the requirements of § 526 is a necessary, but not sufficient, condition of approval; the use still must be expressly permitted in the relevant district. Lathrop's theory asks that we read "in any district" without restriction. Thus, meeting the requirements of § 526 is sufficient to meet the requirements of conditional use approval because sand and gravel extraction is conditionally permitted *in any district*.

¶ 21. Our decision is greatly affected by the standard of review. Although we review the environmental court's legal conclusions de novo, *In re Grp. Five Invs. CU Permit*, 2014 VT 14, ¶ 4, 195 Vt. 625, 93 A.3d 111, we will uphold those conclusions if "they are reasonably supported by the findings." *In re Champlain Oil Co. Conditional Use Application*, 2014 VT 19, ¶ 2, 196 Vt. 29, 93 A.3d 139. We will defer to the court's factual findings and uphold them "unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." *Id.* We also defer to the environmental court's construction of a zoning ordinance "unless it is clearly erroneous, arbitrary, or capricious," *In re Beliveau NOV*, 2013 VT 41, ¶ 8, 194 Vt. 1, 72 A.3d 918, and to a municipality's interpretation of its own ordinance if it is reasonable and has been applied consistently. *In re Champlain Coll. Maple St. Dormitory*, 2009 VT 55, ¶ 10, 186 Vt. 313, 980 A.2d 273.

¶ 22. ■ This case involves competing claims of statutory interpretation, each relying on a different canon of construction. We interpret zoning ordinances according to the principles of

statutory construction, *In re Laberge Moto-Cross Track*, 2011 VT 1, ¶ 8, 189 Vt. 578, 15 A.3d 590 (mem.), and adopt an interpretation that implements the legislative purpose. *In re Grp. Five Invs.*, 2014 VT 14, ¶ 23. As usual, we start with the plain language and will enforce it according to its terms if it is unambiguous. *Evans v. Cote*, 2014 VT 104, ¶ 13, 197 Vt. 523, 107 A.3d 911. We conclude that the plain language of § 526 is ambiguous and therefore cannot interpret the Bylaw on the plain language alone.[4]

¶ 23. Neighbors base their interpretation of § 526 on the text of 24 V.S.A. § 4407(2) (repealed 2005),[5] from which part of the language of § 526 was derived. They cite *Drumheller v. Shelburne Zoning Board of Adjustment*, 155 Vt. 524, 586 A.2d 1150 (1990), for the proposition that when the language of a regulation closely tracks the language of an enabling statute, the regulation must be construed in the same way as the statute. *Id.* at 529, 586 A.2d at 1152. Consequently, neighbors reason, because the enabling statute here confers on the municipality only the authority to allow conditional uses in any zoning district, and does not state that such uses may be undertaken in all districts so long as the applicant satisfies the relevant criteria, then § 526 cannot be read

---

[4] In many zoning cases, we find the language of the town plan helpful in interpreting the disputed bylaw, but we do not find the Bristol Town Plan helpful here. We recognize that town plans merely are advisory, but, because the bylaws must implement the plan, a plan can aid in interpreting an ambiguous zoning provision. *Kalakowski v. John A. Russell Corp.*, 137 Vt. 219, 225-26, 401 A.2d 906, 910 (1979). No section of Bristol's plan either expressly allows or prohibits sand and gravel removal or any other type of extraction. It encompasses many long-range goals to encourage business development, economic growth, and compatible industrial and commercial siting. Bristol Town Plan 1-4 (2001). The plan also incorporates land use goals for each individual district, which establish the character of the district, recommended uses that should predominate, and features that should be promoted or protected. *Id.* at 4-8. Again, this language is stated in broad, very general terms, and we cannot conclude from it that a bylaw permitting sand and gravel extraction as a conditional use in any zoning district fails to implement these goals.

[5] Section 4407(2) was repealed in 2005 and replaced with § 4414(3)(A), which contains almost identical language. Section 4407(2) stated:

> In any district, certain uses may be permitted only by approval of the board of adjustment or the development review board, if general and specific standards to which each permitted use must conform are prescribed in the appropriate bylaws and if the board of adjustment or development review board after public notice and public hearing determines that the proposed use will conform to such standards.

any more broadly to allow sand and gravel extraction in any district.[6]

¶ 24. ■ We are not persuaded by neighbors' argument. They overextend our statement in *Drumheller* to mean that any time regulatory language is derived from statutory language it must be read in precisely the same manner. The question in *Drumheller* was one of defining an ambiguous term: "developed." Because the language in the ordinance was identical to that of the enabling statute, using the term "developed" in the same manner, we inferred that the drafters of the bylaw intended the term to have the same meaning as in the statute. *Id.* We then looked to the related definition section in the statute to discern the term's meaning. *Id.* Here, however, we are not comparing identical language. While the language of § 526 indeed has been derived from the statute, the nature of the language as transposed from the statute to the Bylaw has been altered from the general — municipalities may permit conditional uses — to the specific — sand and gravel extraction requires a conditional use permit. We cannot conclude here as we did in *Drumheller* that the Bylaw regulating sand and gravel extraction must be read in precisely the same manner as the enabling statute.[7]

¶ 25. ■ The fact that myriad other towns have adopted the same pro forma language with respect to sand and gravel extraction, all tailored somewhat differently, lends further support for our conclusion.[8] If we were to interpret every such bylaw in the same manner as the statute, we would negate the more

---

[6] Neighbors also point to 24 V.S.A. § 4407(8) (repealed 2005), discussed *supra*, ¶ 13 n.3, but this adds nothing to their argument. In fact, this subsection of the statute may hurt their argument, *infra*, ¶ 26, that we cannot interpret the Bylaws in such a way that singles out sand and gravel extraction for special treatment. A clause at the end of § 4407(8) stated that it "does not apply to mining or quarrying." Clearly the Legislature found reason to single out sand and gravel extraction as distinct from mining and quarrying and entitled to special treatment.

[7] Neighbors also cite *In re Bailey*, 2005 VT 38A, 178 Vt. 614, 883 A.2d 765 (mem.), to advance essentially the same argument. Under *Bailey*, we stated that we owe no deference to the environmental court's interpretation of an ordinance when the ordinance does not deviate from the enabling statute. *Id.* ¶ 9. Because we conclude here that the language of § 526 does deviate from the statute, *Bailey* does not control.

[8] See, e.g., Town of Ferrisburgh Zoning Bylaws § 5.8 (2010); Town of Lincoln Zoning Regulations § 570 (2011); Town of Morgan Zoning Bylaws § 312 (2012); Town of Proctor Zoning Regulations § 436 (2008); Town of Stratton Zoning Ordinance &

individualized language incorporated by the towns into these bylaws.[9]

¶ 26. Nor are we persuaded by neighbors' other related arguments. They argue that it makes no sense for the Town to single out sand and gravel extraction for special treatment. While it is not for us to judge the wisdom of the drafters in choosing to incorporate this Bylaw, we do note that the Town contains several sand and gravel extraction operations, as found by the ZBA when reviewing Lathrop's first application. The proliferation of these operations may suggest that the region is well-suited for this type of operation, or that the Town itself finds a strong demand for sand and gravel. Whatever the rationale, it is reasonable for the Town to create an exception for this type of activity. And the fact that so many other towns have followed suit with similar bylaw provisions suggests a larger trend toward favoring sand and gravel operations throughout the state. Moreover, as we observed above, *supra*, ¶ 23 n.6, the Legislature treated soil, sand, and gravel removal separately from other extraction activities when it passed 24 V.S.A. § 4407(8).

¶ 27. In another related argument, neighbors predict that the ZBA's and environmental court's construction of § 526 will result in sand and gravel extraction in districts reserved for residential use, the historic downtown, or other areas not suitable for intensive industrial operations, thereby interfering with the use and enjoyment of those neighboring properties impacted by the operations. They cite to the seminal zoning case *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926), to support their contention that construing zoning regulations narrowly in favor of the landowner cuts both ways. Neighbors liken sand and gravel

---

Permit Handbook § 10045 (2007); Town of Thetford Zoning Bylaws § 5.02 (2011); Town of Westfield Zoning Bylaws § 313 (2010); Town of Woodbury Zoning Ordinance § 3.9 (1989).

[9] We think it is worth noting that an interpretation of § 526 that permits sand and gravel extraction in all districts does not give the Town any broader authority than conferred upon it by the enabling statute. See *City of Montpelier v. Barnett*, 2012 VT 32, ¶ 20, 191 Vt. 441, 49 A.3d 120 ("[A] municipality has only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof." (quotation omitted)). The statute authorizes the Town to provide for conditional uses and ensure that those uses meet the minimum standards set forth in the statute. 24 V.S.A. § 4414(3)(A). The Town is within its discretion to choose the districts within which conditional uses may be located.

operations in the Town's many nonindustrial districts to the notorious "pig in a parlor" from *Euclid* — the right thing in the wrong place that creates a nuisance for the surrounding properties. *Id.* at 388.

¶ 28. ■ We emphasize that just because the Bylaws permit sand and gravel extraction in any district does not mean that such an operation will end up in the middle of a high-density residential or commercial district, a sensitive conservation district, or on any other parcel of land where it is incompatible with surrounding uses. Such is the nature of conditional use review to ensure that the uses are appropriately sited and conditioned to harmonize with their surroundings. Not only does § 4414(3)(A) provide baseline standards for review, including that the proposed use "shall not result in an undue adverse effect on . . . [t]he character of the area affected," 24 V.S.A. § 4414(3)(A)(ii), but § 341 of the Bylaws ensures, among other things, a "harmonious relationship between proposed uses and existing adjacent uses." Moreover, the high-density commercial and residential districts invariably offer restrictive lot sizes with strict setback requirements. See Bylaws §§ 1009-1013.

¶ 29. We do find that a number of statutory construction principles aid Lathrop. First, because zoning ordinances "are in derogation of private property rights," they must be construed narrowly in favor of the property owner, *In re Champlain Oil Co.*, 2014 VT 19, ¶ 2, and "any ambiguity is resolved in favor of the landowner." *In re Tyler Self-Storage Unit Permits*, 2011 VT 66, ¶ 16, 190 Vt. 132, 27 A.3d 1071 (quotation omitted). Neighbors misunderstand the rationale behind this rule. They reason that it equally should favor the rights of neighboring property owners, but their reliance on *Euclid* here undercuts their argument. *Euclid* concerned a municipality's power to regulate land use within the constraints of the United States Constitution's substantive due process protections. The United States Supreme Court upheld zoning regulations, recognizing that a municipality may have a rational reason for separating incompatible uses, and set the precedent that zoning regulations are presumptively valid. *Euclid*, 272 U.S. at 395. Ambiguous zoning regulations, however, risk arbitrary and capricious exercise of the police power in violation of due process. 1 A. Rathkopf et al., The Law of Zoning and Planning § 2:3 (4th ed. 2014). The strict construction rule serves to protect the landowner whose common law property

rights are being restricted by the regulation. We do, however, recognize that neighboring property owners have a right to the use and enjoyment of their property; the common law nuisance doctrine protects this right. As such, any ambiguity in § 526 is construed in favor of Lathrop.

¶ 30. Second, if we adopt neighbors' interpretation, we will be reading a restrictive condition into the Bylaw — the condition that "in any district" means "in any district where sand and gravel extraction is permitted." We generally do not read conditions into the language of the bylaw unless necessary to make it effective. See *Brennan v. Town of Colchester*, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999). As we can interpret the Bylaw effectively without imposing such a condition, we must not do so here.

¶ 31. [7] Finally, a commonly recognized method for reconciling conflicting statutory provisions is to hold the specific provision as an exception to the general. *Smith v. Desautels*, 2008 VT 17, ¶ 17, 183 Vt. 255, 953 A.2d 620; see also *Stevenson v. Capital Fire Mut. Aid Sys., Inc.*, 163 Vt. 623, 624-25, 661 A.2d 86, 88 (1995) (mem.) (holding that statute providing immunity for fire departments and their personnel trumps statute providing for waiver of sovereign immunity upon purchase of insurance and concluding that fire departments therefore are immune from liability regardless of insurance). This also is applicable in the context of municipal ordinances. See 6 E. McQuillin, The Law of Municipal Corporations § 20:63 (3d ed. rev. 2007) ("When general and specific provisions are employed in ordinances, where there are two provisions, one general and the other specific and relating to only one subject, the specific provision ordinarily must prevail and be treated as an exception to the general provision."). Here, by the use of general terms — heavy manufacturing, industry, unenclosed manufacturing — sand and gravel extraction would appear to be prohibited in all but the C-1 district. But we must read the specific provision, § 526, as an exception to this general rule, thereby treating sand and gravel extraction as an exception to the prohibition on heavy manufacturing. While neighbors contend that the other Bylaws are equally specific, we cannot overlook the fact that nowhere in the Bylaws is sand and gravel extraction ever explicitly regulated or even mentioned — except in § 526. This is the same reasoning supplied by both the ZBA and the environmental court, and we find no reason not to defer to their interpretation.

¶ 32. Lathrop's interpretation also has some support in our prior case law. In *In re John A. Russell Corp.*, 2003 VT 93, 176 Vt. 520, 838 A.2d 906 (mem.), we looked at similar inconsistencies with respect to conditional uses in the Town of Clarendon's bylaws. There, the appellants argued that asphalt plants are prohibited in the commercial-residential district because they are not listed as a permitted use within that district. We concluded that the bylaw regulating uses within the commercial-residential district "does not limit . . . the [Town of Clarendon Zoning Board of Adjustment's] authority to approve an asphalt plant as a conditional use under the separate conditional use provision." *Id.* ¶ 27. We further stated, in response to the appellants' observation that another bylaw sets forth a specific list of conditional uses allowed in other zoning districts, that "[w]e discern no basis to conclude from this that the ordinance may not incorporate a different approach for the commercial-residential district by allowing a [conditional use permit] for those uses not otherwise permitted." *Id.*

¶ 33. ██ We therefore conclude that our deferential standard of review and the principles of statutory construction favor Lathrop's interpretation that the Bylaws allow sand and gravel extraction as a conditional use in any district. The environmental court did not err in holding that the project location did not violate the Bylaws.

## II.

¶ 34. As we have concluded that Lathrop's proposed sand and gravel extraction operation is permitted as a conditional use in the RA-2 and MIX districts, we must determine if the project will create a "pit" within the meaning of § 526(2). The court found that upon completion of the excavation the reclaimed area will be left with a cavity measuring 1000-by-1100 feet across and 100 feet deep at its deepest point. The issue is whether this cavity is a pit.

¶ 35. Section 526(2), the controlling Bylaw, provides:

> The removal of material shall be conducted so as to result in the improvement of the land, having due regard to the contours in the vicinity such as leveling slopes and removing hills. The digging or creating of pits or steep slopes shall not be permitted, unless provision is made to refill such pit.

The term "pit" in § 130, the definition section of the Bylaws, is cross-referenced with "quarry," which is defined as "[m]arble, granite, or other stone extraction operations and any land development incidental thereto . . . includ[ing] extraction of soil, sand or gravel and the enlargement of any existing quarrying excavations." Although "steep slope" is not explicitly defined, § 526(7) requires that "slopes in excess of one to two shall be adequately fenced."[10]

¶ 36. The 2004 ZBA concluded that Lathrop's project would not create a pit. The ZBA found that no definition of pit was provided in the Bylaws and referenced a dictionary definition describing pits as having "vertical sides." In a reversal of its 2004 interpretation, the 2008 ZBA concluded that § 526(2) prohibits any substantial depression or large hole in the landscape that remains unfilled, no matter how steep the slopes. The ZBA observed that § 526 targets open-pit techniques, which result in alterations to the landscape that do not "mesh[] with the surrounding contours of the land." The ZBA emphasized that "[a]t the end of the day, the intent of § 526(2) is for the discontinued pit site to blend in with the surrounding landscape, rather than leave the landscape in a state that testifies unremediated removal of material."

¶ 37. The environmental court adopted the interpretation of the 2004 ZBA and concluded that because Lathrop's project would maintain slopes of no more than 1:2 (rising one foot for every two feet across) during the lifetime of the project and result only in a "shallow saucer" with a 1:10[11] slope in the end, it would not have steep slopes and therefore not create a pit. The court supported its interpretation with the language of § 526(7), which requires that steep slopes be fenced. The court reasoned that Lathrop's "shallow saucer" is neither susceptible to filling with water nor capable of becoming a dangerous attractive nuisance.

¶ 38. Neighbors argue that the court's interpretation is too restrictive and that the court erroneously conflated the terms "pit" and "steep slope," thereby failing to serve the purpose of restor-

---

[10] Although it is not entirely clear whether "one to two" slopes rise one foot for every two feet across or vice versa, it does not bear on the question of whether Lathrop's project creates a pit. Furthermore, as the environmental court found, the slopes at Lathrop's site never would exceed a rise of one foot for every two feet across — the shallower interpretation of "one to two."

[11] The environmental court erroneously used the designation 10:1 in describing the slopes, but the official mathematical designation is 1:10 (rise over run).

ing the landscape to its pre-extraction condition. They argue that this interpretation ignores the common usage of the term and fails to achieve the Bylaw's landscape-remediation goals. Neighbors further argue that the ZBA's 2008 decision broadly interpreting the term should receive deference. Lathrop counters that neighbors' interpretation is irreconcilable with the Bylaw's definition of "steep slope," reasoning that a "pit" must have at least a "one to two" slope. Lathrop further counters that because the 2004 and 2008 ZBAs reached opposite conclusions, it is clear that the term is ambiguous and that the environmental court's interpretation is reasonable and entitled to deference. We agree with neighbors and uphold the 2008 ZBA's interpretation of § 526(2).

¶ 39. As stated above, we review questions of law de novo and factual findings for clear error, and we also review interpretations of zoning ordinances for clear error. *Supra*, ¶ 21. We interpret zoning ordinances under the principles of statutory construction and resolve ambiguity in favor of the landowner. *Supra*, ¶¶ 22, 29.

¶ 40. ■ At the heart of the parties' dispute is not just the definition of pit but where to look for that definition. The briefs and decisions below supply a laundry list of dictionary definitions, and the language of § 526 has been picked apart to discern some meaning. What has been overlooked completely, however, is the reference to "pit" in § 130, the definition section of the Bylaws. See *In re Burlington Airport Permit*, 2014 VT 72, ¶ 21, 197 Vt. 203, 103 A.3d 153 ("[A] word used throughout an act or statutes in pari materia bears the same meaning throughout the act, unless it is obvious that another meaning was intended." (quotation omitted)). "Pit" is cross-referenced with "quarry," which broadly encompasses stone-extraction operations and expressly includes sand and gravel removal. Bylaws § 130. Thus, "pit" can be defined as the resulting cavity created by the extraction activities defined under "quarry." The 2008 ZBA's interpretation — that pits result from open-pit techniques employed in quarrying and similar extraction activities — aligns with this definition.

¶ 41. Having a definition provided within the Bylaws, we need not resort to dictionary definitions. See *Franks v. Town of Essex*, 2013 VT 84, ¶ 8, 194 Vt. 595, 87 A.3d 418 ("Words that are not defined within a statute are given their plain and ordinary meaning, which may be obtained by resorting to dictionary definitions."). We nonetheless conclude that the § 130 definition fits

comfortably within the ordinary understanding and common usage of the term. The 2004 ZBA supplied two very restrictive definitions of "pit," while the 2008 ZBA furnished a large number of broader definitions — e.g., hole, cavity, indentation, excavation — that capture the term in its most ordinary sense. The definitions selected by the 2004 ZBA require that pits have almost vertical or perpendicular slopes, but nothing in § 130 suggests this restrictive reading.

¶ 42. The environmental court provides an equally restrictive interpretation, not through dictionary definitions but from § 526(7), which seemingly defines "steep slopes" as having a rise of 1:2 or greater. The court's rationale derives from the public safety concerns implied in § 526(7)'s requirement that steep slopes be fenced. While these public safety concerns are valid, and an interpretation founded on such concerns may be reasonable, the court still overlooks both the § 130 definition, which makes no mention of steep slopes, and the remediation goals evinced within § 526. In addition, as neighbors point out, the environmental court improperly conflated the terms "pit" and "steep slope." Because the terms are separated by "or" they must be read disjunctively and given separate meanings. *Loughrin v. United States*, ___ U.S. ___, ___, 134 S. Ct. 2384, 2390 (2014).

¶ 43. Moreover, the effect of the court's interpretation is to nullify the Bylaws' refill requirement. It will always be easier and less expensive to create slopes that meet the degree-of-steepness requirement than to refill a pit. For example, if Lathrop were to excavate a cavity that resembles a box with horizontal dimensions of 1000-by-1100 feet and a uniform depth of 100 feet, it would remove 110 million cubic feet of material. It would then have to refill the pit with that same amount of material. Lathrop could create, however, the "one to two" sloped walls with roughly one-third of the material, obviously a less expensive alternative. While the difference depends on the amount of extraction, the creation of sloping walls will always be easier and less expensive than refilling the cavity. It is unreasonable to conclude that the Town created a bylaw requirement that is never applicable, except in theory. We therefore conclude that the 2004 ZBA's and environmental court's interpretation of § 526(2) is clearly erroneous, and we uphold the 2008 ZBA's interpretation of the Bylaw.

¶ 44. Having resolved the legal question that the court's definition of "pit" is incorrect, and having provided the proper defini-

tion, we must consider the factual question of whether Lathrop's project will result in a pit under this definition. We review mixed questions of law and fact de novo. See *Luck Bros., Inc. v. Agency of Transp.*, 2014 VT 59, ¶ 26, 196 Vt. 584, 99 A.3d 997 (stating that our review of mixed questions of law and fact is nondeferential and on-the-record). Under a broad reading of pit, as defined by the 2008 ZBA, even a "shallow saucer" with 1:10 slopes would constitute a pit because it would be a depression in the landscape that does not blend with the surrounding contours. The vertical-walled cavity described in the above hypothetical would produce approximately 4.08 million cubic yards of material. The environmental court found that Lathrop proposes to extract 2.67 million cubic yards of material, roughly two-thirds the amount of material that would be extracted from the hypothetical vertical-walled cavity. Except by focusing on the slope of the walls, as the environmental court did, it is difficult to see how one cavity is a pit while the other is not.

¶ 45. ■■■ Again, we emphasize that the environmental court's rationale that the resulting cavity would not threaten public safety or fill with water is not part of the analysis. The site will be excavated for the removal of sand and gravel with an open-pit technique; this is precisely the type of activity targeted under the definition of "quarry," as incorporated by reference into the definition of "pit."

¶ 46. We therefore reverse the environmental court's decision and hold as a matter of law that Lathrop's project creates a "pit" within the meaning of § 526(2).

¶ 47. While we have reversed the environmental court's decision that the project would not create a pit, this holding does not end the inquiry into whether the project violates § 526(2) of the Bylaws. The ZBA denied the zoning permit because it ruled that Lathrop failed to make provisions to refill the pit. Lathrop claimed in its statement of issues on appeal to the environmental court that the ZBA should not have denied the permit but instead should have imposed a permit condition requiring compliance with § 526(2). At the environmental court, Lathrop argued that its proposal to regrade the land for future development was a sufficient provision for refilling a pit and therefore satisfied the requirement of § 526(2). The court never reached these arguments because it concluded that the project would not create a pit.

Accordingly, the case is remanded to the environmental court to address Lathrop's other compliance claims. Because our holding with respect to § 526(2) does not end the controversy, we consider the other issues raised in the appeal.

## III.

¶ 48. We next address the issue of whether the environmental court was precluded from hearing and adjudicating Lathrop's revised permit application or issuing a judgment inconsistent with the 2004 permit issued by the ZBA. Neighbors argue that, because the application Lathrop finally presented to the environmental court in *Lathrop II* is not substantially different from the application it submitted to the ZBA in 2003 in *Lathrop I*, it should be barred by the successive-application doctrine. Lathrop responds that the successive-application doctrine is premised on the local board *denying* the initial application, not *approving* the application, as occurred here. Moreover, Lathrop argues that its revised application indeed was substantially different, as recognized by the ZBA when it reviewed the new application in 2008. The environmental court agreed with Lathrop and concluded that it had jurisdiction to review the application. We disagree with the court's analysis and reverse and remand on this issue as explained in more detail below.[12]

¶ 49. Because resolution of this issue will require a full analysis of all the principles related to issue and claim preclusion in zoning cases, we start with an explanation of what was presented and what was either allowed or disallowed in the three adjudications — the first adjudication by the 2004 ZBA, the second adjudication by the 2008 ZBA, and the third and final adjudication by the environmental court.

¶ 50. We have attached to this opinion, as the Appendix, a chart containing for each important component of the project an entry describing the component: (1) in the 2003 application to the ZBA

---

[12] Lathrop contends that neighbors failed to preserve this issue for appeal because they never appealed the 2008 ZBA's review of Lathrop's revised application but instead collaterally attack that decision in this consolidated appeal. Neighbors are correct in pointing out that what they are contesting is not the 2008 ZBA's review of the application but the environmental court's review of an application they claim is essentially the same as that already conditionally approved by the 2004 ZBA. Neighbors raised the issue in a pretrial motion, which the court denied. They have preserved the issue for appeal.

(as amended in 2004); (2) in the ZBA's 2004 decision approving the proposal with conditions; (3) in the second application to the ZBA in 2007; (4) in the amended proposal to the environmental court; and (5) as conditioned in the environmental court's decision.[13] As an overview, the project as approved by the ZBA in 2004 and the project as proposed by Lathrop in 2007 differ in two primary respects: (1) the extraction rate and its consequences and (2) the location of the access point.

¶ 51. The first main difference is the extraction rate and the consequences that flow from the changed rate. In its 2003 application, Lathrop proposed to extract only 60,000 cubic yards per year. In its 2007 application, Lathrop proposed 60,000 cubic yards per year only for the first fifteen years; it proposed to excavate 100,000 cubic yards per year thereafter. To accommodate the increased excavation rate, Lathrop proposed doubling the average and maximum allowable truck trips and lengthening the hours of operation. The 2004 ZBA allowed, as proposed by Lathrop, an average of 17 truckloads per day with a maximum peak of 34 truckloads per day. The 2007 proposal sought an average of 36 truckloads per day, with a peak of 72 truckloads per day. This higher number of truckloads was proposed for the entire duration of the project, not just after the fifteenth year when the extraction rate would increase.

¶ 52. The second main difference is the location of the access point. The 2003 proposal provided access off South Street on the northern edge of the property. The 2007 proposal changed the access point to Rounds Road on the southern edge of the property. Trucks leaving the property by either exit would reach Hewitt Road proceeding west from the project, but would reach that road by different routes. Due to this relocation of the access point, different adjacent property owners would be exposed to truck traffic along the route between the project site and Hewitt Road.

¶ 53. On appeal from the 2008 ZBA decision denying its permit, Lathrop presented a virtually identical proposal to the environmental court. It then modified its proposal to change the location of the access point back to the South Street route approved by

---

[13] The application to the district commission was virtually identical to the 2007 proposal to the ZBA. The original proposal to the environmental court also was identical to the 2007 proposal to the ZBA, but was modified to change the access point in applicant's evidentiary presentation.

the 2004 ZBA. In all other respects the proposal was identical to the proposal that Lathrop made to the ZBA in 2007.[14] Except in relatively minor respects the environmental court approved Lathrop's proposal.

¶ 54. ▪ With this overview in mind, we proceed to the applicable law. Two preclusion doctrines are implicated in this decision: the standards and restrictions on zoning permit amendments and the successive-application doctrine. Each of these doctrines is governed by and must be consistent with the controlling statute, 24 V.S.A. § 4472(d), which provides:

> Upon the failure of any interested person to appeal to an appropriate municipal panel under section 4465 of this title, or to appeal to the Environmental Division under section 4471 of this title, all interested persons affected shall be bound by that decision or act of [the administrative] officer, the provisions, or the decisions of the panel, as the case may be, and shall not thereafter contest, either directly or indirectly, the decision or act, provision, or decision of the panel in any proceeding, including any proceeding brought to enforce this chapter.

This statutory requirement underlies all preclusion rules in zoning cases. It is very broadly stated, applying to decisions of both the local administrative officer and the local hearing panel — here the ZBA. With respect to the ZBA, it insulates from collateral attack any decision or act of the ZBA and defines collateral attack to include both direct and indirect challenges.

¶ 55. ▪ Before analyzing the two preclusion doctrines, we address one application of § 4472(d) that is important to this case: that permit conditions or amendments may be challenged on appeal but cannot be attacked collaterally. In *Village of Woodstock v. Bahramian*, 160 Vt. 417, 631 A.2d 1129 (1993), a zoning applicant appealed to the superior court a denial by the local planning commission of amendments to its preexisting permit.

---

[14] Lathrop's engineering consultant testified that "in essence, [it is] the same project" as that submitted to the ZBA in 2003. This characterization underlies many of the arguments of the parties. In general, the characterization is wrong and is the cause of confusion in this case. While it is similar to Lathrop's initial proposal in 2003, it differs significantly from the amended 2004 proposal, which was the proposal considered by the 2004 ZBA.

Without filing a cross-appeal, the Village of Woodstock sought reversal of other amendments approved by the planning commission but not part of the applicant's appeal. The superior court concluded that because its review under § 4472(d) is de novo, it could consider the entire application, including those amendments challenged by the Village. We held that the superior court erred in reviewing the entire application because, as the Village did not appeal, "the alterations that were approved by the commission were not properly before the court." *Id.* at 424, 631 A.2d at 1133; see also *In re Hildebrand*, 2007 VT 5, ¶ 11, 181 Vt. 568, 917 A.2d 478 (mem.) (stating that unappealed permit conditions are final under 24 V.S.A. § 4472 and may not be challenged collaterally); *In re Garen*, 174 Vt. 151, 156, 807 A.2d 448, 451 (2002) (stating that issues on appeal to environmental court are limited to those identified in statement of questions filed in connection with notice of appeal).

¶ 56. ■ The first preclusion doctrine implicated in this case deals with the standards and restrictions on zoning permit amendments, which we have held are allowable under 24 V.S.A. § 4472(d). *Hildebrand*, 2007 VT 5, ¶ 12. There are no statutory standards that an amendment to a zoning permit or condition must meet; nor in this case do the Town's bylaws establish any standards. We first considered the availability of permit amendments to zoning and other land use permits in *In re Stowe Club Highlands*, 166 Vt. 33, 687 A.2d 102 (1996). In *Stowe Club Highlands*, upon review of an Act 250 proceeding, we determined "under what circumstances . . . permit conditions may be modified." *Id.* at 37, 687 A.2d at 105. Our decision generally affirmed the reliance on factors that had been identified by the former Environmental Board: (1) whether there had been "changes in factual or regulatory circumstances beyond the control of a permittee"; (2) whether there had been "changes in the construction or operation of the permittee's project, not reasonably foreseeable at the time the permit was issued"; and (3) whether there had been "changes in technology." *Id.* at 38, 687 A.2d at 105. These factors are intended to "assist in assessing the competing policies of flexibility and finality in the permitting process." *In re Nehemiah Assocs.*, 168 Vt. 288, 294, 719 A.2d 34, 37 (1998). We applied the holding of *Stowe Club Highlands* to a municipal zoning permit in *Hildebrand*. In *Hildebrand*, we affirmed the environmental court's importation of the *Stowe Club Highlands* factors on the reasoning

that the competing interests in Act 250 and municipal zoning cases are so similar. *Hildebrand*, 2007 VT 5, ¶ 13.

¶ 57. That our authorization of permit amendments is a liberalization of preclusion rules is demonstrated by *In re Dunkin Donuts*, 2008 VT 139, 185 Vt. 583, 969 A.2d 683 (mem.). There, the applicant had sought unsuccessfully to build a Dunkin Donuts restaurant with a drive-through window but finally obtained a permit by eliminating the window from its proposal. A neighboring business appealed the board's grant of the permit and settled the appeal pursuant to a stipulation that the project would not include drive-through service. The settlement was incorporated into a court judgment. Nonetheless, the applicant thereafter applied for and was granted an amendment to install a drive-through window. On appeal, the environmental court reversed the decision of the development review board, holding that the issue of drive-through service was controlled by the original court judgment and that the judgment could be set aside only by meeting the standards for relief from judgment contained in Vermont Rule of Civil Procedure 60(b). *Id.* ¶¶ 2-5. Although the environmental court's decision could be viewed as a routine application of § 4472(d), we reversed on the basis that preclusion applies flexibly to administrative proceedings. *Id.* ¶ 7. As explained *infra*, ¶ 64, we applied the successive-application doctrine to an amendment request, but we held that the development review board could amend the prior permit so long as the amendment addressed the concerns that prevented approval of the drive-through window in the original proposal. *Id.* ¶ 13.

¶ 58. The second preclusion doctrine implicated here is the successive-application doctrine. This preclusion doctrine provides that a local board "may not entertain a second application concerning the same property after a previous application has been denied, unless a substantial change of conditions had occurred or other considerations materially affecting the merits of the request have intervened between the first and second application." *In re Carrier*, 155 Vt. 152, 158, 582 A.2d 110, 113 (1990) (quotation omitted); see also *In re Woodstock Cmty. Trust & Hous. Vt. PRD*, 2012 VT 87, ¶ 4, 192 Vt. 474, 60 A.3d 686. The second application can be granted "when the application has been substantially changed so as to respond to objections raised in the original application or when the applicant is willing to comply with conditions the commission or court is empowered to impose." *In re*

*Carrier*, 155 Vt. at 158, 582 A.2d at 113. In an attempt to balance the competing concerns of flexibility and finality in zoning decisions, the successive-application doctrine carves an exception out of the otherwise rigid standard of preclusion of § 4472(d) to allow local boards the ability to respond to changing circumstances that often arise in zoning decisions. *In re Woodstock Cmty. Trust*, 2012 VT 87, ¶ 4; *In re Dunkin Donuts*, 2008 VT 139, ¶ 9. The policy behind preclusion is to "protect the courts and the parties from the burden of relitigation." *Russell v. Atkins*, 165 Vt. 176, 179, 679 A.2d 333, 335 (1996). The successive-application doctrine in particular encourages applicants "in the interest of finality and judicial economy" to be thorough in their initial applications. *In re Armitage*, 2006 VT 113, ¶ 10, 181 Vt. 241, 917 A.2d 437.

¶ 59. ▇▇▇ In general terms, the amendment rules are an application of issue preclusion, or collateral estoppel, in the less-rigid environment of zoning adjudication — they apply to the issues actually resolved in the adjudication process and reflected in the decision on the permit application. The successive-application doctrine is an application of claim preclusion, or res judicata, in the special environment of zoning adjudication — it applies to the overall claim that the project is entitled to a permit.[15] They should be viewed as flexible applications of the comprehensive standard of § 4472(d) that allow changes in proposals or permits without destroying the finality of decisions on which both interested parties and the public rely.

¶ 60. In essence, the environmental court held that neither of the specific preclusion doctrines applied and, as a result, no preclusion was involved. It found that the permit amendment requirements did not apply because Lathrop never had sought a permit amendment,[16] and it found that the successive-application doctrine did not apply because Lathrop had not been denied a permit in 2004. The court did not address whether § 4472(d)

---

[15] We described the successive-application doctrine as an application of issue preclusion in *Woodstock Community Trust*, 2012 VT 87, ¶ 4. In the earlier *Dunkin Donuts* decision, 2008 VT 139, ¶ 7, we characterized the doctrine as an application of claim preclusion. The description in *Dunkin Donuts* was correct, and we employ it in this opinion. To the extent it may be relevant in the future, we correct the mistake in *Woodstock Community Trust*.

[16] The court did not actually rule on the applicability of permit amendment requirements, although they were discussed in filings from the neighbors. Our discussion reflects the necessarily implied ruling of the court.

imposed any restrictions on its actions, given that the successive application and permit amendment requirements did not apply.

¶ 61. The court did focus on the permit conditions imposed in *Lathrop I* by the 2004 ZBA, but the rationale for the court's decision on this point is not entirely clear beyond its apparent reliance on the *Lathrop II* 2008 ZBA decision that the second application "differs substantially" from that approved in 2004 and the fact that Lathrop's 2004 permit was not denied. The court went on to state that Lathrop raised on appeal "whether the original conditions imposed by the ZBA are appropriate" and that it concluded that Lathrop "preserved its ability to assert that its revised project conforms to the Bylaws without condition."[17] It went on to state that it would consider conditions "which may or may not coincide with the twenty-three conditions the ZBA imposed in its approval of Lathrop's original proposal."

¶ 62. The logic of the environmental court's decision takes us in the wrong direction. If the flexible preclusion doctrines do not apply, we must analyze the circumstances under 24 V.S.A. § 4472(d), with a result directly contrary to that of the environmental court. The *Lathrop II* application contests, at least indirectly, the decision of the 2004 ZBA in *Lathrop I*, to the extent that there is an inconsistency between them. Thus, it violates § 4472(d), and the ZBA should not have entertained it.

¶ 63. The reason that the environmental court's decision goes in the wrong direction is that it elevates form over substance. As neighbors note, the *Lathrop I* decision could have been expressed either as a *denial* of a permit until certain conditions are met or as an *approval* of a permit so long as certain conditions are met. It is illogical to reject the use of the successive-application doctrine in one instance and not the other. Similarly, it is illogical to apply one standard when a permit holder seeks an amendment to the permit and another when a permit holder seeks a new

---

[17] It is not clear what action of Lathrop the court is referring to. In the appeal of *Lathrop II*, Lathrop filed a list of questions and an amended list of questions. In neither is there a question with respect to the 2004 conditions. In the appeal of *Lathrop I*, neighbors submitted questions, pursuant to Vermont Rule for Environmental Court Proceedings 5(f), one of which asked whether the application "adequately addressed all proper concerns for the health and safety of the residents." This question might be taken to have raised impliedly the adequacy of the ZBA conditions, but it did not help Lathrop, which was prohibited from submitting questions without a cross-appeal. See *In re Garen*, 174 Vt. at 156, 807 A.2d at 451.

permit, the purpose of which is to amend the conditions in the preexisting permit. The preclusion doctrines should apply when the circumstances to which they respond arise, and not based primarily on the form of the action that the applicant seeks or the form of the earlier action of an adjudicatory panel. In a complex case like this one, it is possible, even likely, that both preclusion doctrines should apply, just as it is possible that in civil litigation both issue and claim preclusion can be involved.

¶ 64. Our decision in *Dunkin Donuts* illustrates the flexibility both in the preclusion doctrines and in how they are employed. Although that case involved a permit amendment, we applied the successive-application doctrine, even though there never was a permit denial. Our holding there directly responded to the environmental court's holding that the successive-application doctrine does not apply when a permit has been granted. More importantly, we broadly applied the successive-application doctrine because we had not yet held that the standards for permit amendments developed for Act 250 proceedings in *Stowe Club Highlands* also apply to zoning cases. See *In re Dunkin Donuts*, 2008 VT 139, ¶ 9 n.2 (citing *Stowe Club Highlands* but explaining that "an independent set of rules, not the successive-application doctrine, are applied to Act 250 permit amendment requests"). After our decision in *Hildebrand*, applying the *Stowe Club Highlands* standards for permit amendments, *Dunkin Donuts* should be viewed as a permit amendment case. *Dunkin Donuts* is important, however, because of its flexible use of the successive-application doctrine in applying preclusion principles.

¶ 65. A good example of the proper application of preclusion doctrines to facts like those before us is *DeTray v. City of Olympia*, 90 P.3d 1116 (Wash. Ct. App. 2004). In *DeTray*, the developer sought a permit for a mobile home park abutting a lake and accessible via a private road. The developer received the necessary permit with two conditions: one requiring dedication of the private road as a public road and a second requiring creation and dedication of an extension of an existing pedestrian trail around the lake. The developer appealed, attempting to strike the conditions, but later abandoned the appeal. Thereafter, the developer submitted a new proposal, which he called a modification of the previous application, that reduced the number of mobile homes, added a senior citizen apartment building, and also included the public road and pedestrian trail extension. The

developer received permits for this proposal but again appealed, seeking to strike the public road and pedestrian trail extension requirements. In response to the city's argument that he was precluded from again challenging the requirements for failure to continue the appeal from the earlier permit, the developer responded that the new proposal was such a substantial change from the earlier one that no preclusion applied. The court rejected the developer's argument and held that a substantial change in the overall development proposal is not sufficient to allow the striking of the original permit conditions, especially where the new proposal increased the need for those conditions. *Id.* at 1123. The court stressed that the failure of the developer to pursue his original appeal made the conditions final and that claim preclusion prevented the developer from challenging them in this new successive application. *Id.*

¶ 66. ▪▪▪ The case before us should proceed similarly. Where there is a preexisting permit, it should not matter to applicable regulatory standards whether the applicant submits a new application or requests an amendment to an existing permit. The first step is to determine whether there is a judgment with preclusive effect. If so, the second step should be review of the proposal as a whole. If the board or court concludes that there is a substantial change from the permitted project,[18] review should proceed as if there is no prior permit. In the relaxed environment of zoning permits, it is not determinative that the applicant could have or should have made the new proposal at the time of the original permit review. The third step is that conducted for permit amendments. To the extent the applicant seeks to change or avoid permit restrictions or conditions, the applicant must meet the standards for permit amendments as set forth in *Hildebrand* [19] in light of the new project and any restrictions and conditions imposed from the second step.

¶ 67. Looking at the first step in this case, there is a judgment — the 2004 ZBA permit — with preclusive effect as specified in 24 V.S.A. § 4472(d). While the permit is not final because of neighbors' appeal, it is final with respect to any change from

---

[18] Of course, the applicant can indicate that any changes are not substantial and, if the board or court agrees, proceed to the third step.

[19] These standards are applicable if the zoning bylaws do not set forth different ones.

Lathrop because Lathrop failed to appeal. This result is commanded by *Bahramian* as described above, *supra*, ¶ 55.

¶ 68. The ZBA conducted the second step of the review in 2008, and the environmental court relied upon that review to reach its conclusions and order. The ZBA review was conducted, however, with respect to a proposal that was significantly different from that approved by the environmental court. As we discussed above, *supra*, ¶¶ 51-52, the two main differences between the 2007 proposal and the 2004 ZBA approval were the annual extraction rate and the location of the access point. Under the environmental court's order, the project essentially has returned to that approved in 2004 with respect to these two issues.[20] Before the court can consider the project as approved, a substantially different project under the successive-application doctrine, it must analyze the differences from the 2004 permit and find the necessary substantial change.

¶ 69. ▮▮▮ Even if Lathrop is allowed to go further after the second step of review, the conditions and restrictions must be reviewed as permit amendments in light of the changed project. Neither the ZBA nor the environmental court conducted this third step of the review. Assuming it is necessary at all, we leave that review to the environmental court on remand. We do address, however, the truck-travel limits as imposed by the ZBA in 2004 because it is a central point of this appeal and can be resolved as a matter of law.

¶ 70. The 2004 ZBA decision imposed a permit condition that "[g]ravel may be removed from the site at a rate of 17 loaded trucks/day averaged over 250 days of operation, with 34 trucks per day maximum." The environmental court judgment order provided that "Lathrop shall restrict . . . the maximum one way truck trips to no more than 100 per day unless and until authorized by both the District Commission and the ZBA to increase such limits."[21] The decision notes that the trip-rate maximum proposed by Lathrop would mean that Lathrop would

---

[20] The final judgment of the environmental court sets the extraction rate at 60,000 cubic yards, as conditioned in the 2004 permit, but allows Lathrop to seek a permit amendment after fifteen years to allow a higher extraction rate. Since Lathrop could always seek a permit amendment, we do not see that provision in the court's judgment as significant.

[21] Although Lathrop's proposal is confusing, we read it to propose a higher limit, an average daily one-way trip rate of 72 trucks per day and a peak one-way trip rate of 144 trucks per day.

reach the extraction maximum of 60,000 cubic yards if truck traffic were at its maximum, given the size of the trucks Lathrop would use. It found that an average of 23 truck trips per day would allow for the excavation and transportation of 60,000 cubic yards. It noted, however, that if the extraction rate increased to 100,000 cubic yards per year it would take an average of 38 truck trips per day to transport that material. In its findings, it added that "[w]e have some concern, perhaps best explained as uncertainty, of the impact to area highways if the truck traffic from the proposed project continues at the projected maximum rate for more than sixty-two days a year."

¶ 71. Based on the above findings and drawing on the expert testimony and the historic truck traffic on Hewitt Road, the court concluded that a "maximum level of 100 one-way truck trips generated per day . . . will not cause unreasonable congestion or unsafe conditions on the town highways." See 10 V.S.A. § 6086 (a)(5) (Act 250 Criterion 5 (traffic)). The conclusion goes on to state that Lathrop can apply after fifteen years for an increase in the excavation rate and truck-trip maximum. At that time, there will be better evidence of the impacts of the truck traffic.

¶ 72. ▆ While we have no doubt that Lathrop presented a much better and more thorough case to the environmental court in 2012 than it presented to the ZBA in 2004, we see nothing in the court's findings and conclusions to support a permit amendment with respect to truck traffic. As we held with respect to the successive-application doctrine, and it applies equally here, an applicant seeking a permit amendment may not merely introduce new evidence that it could have presented in the initial proceeding. *In re Armitage*, 2006 VT 113, ¶ 10.

¶ 73. ▆ As in *DeTray*, the main question is whether the permit amendment is motivated by changes in construction or operation of the project not reasonably foreseeable at the time the permit was issued, one of the three critical factors in *Hildebrand*, 2007 VT 5, ¶ 7. The testimony regarding the contested application conditions indicates that no such change in circumstances occurred, but rather that Lathrop finds the conditions impractical. As we look at the changes in the project from 2007 through the environmental court's approval, we see none that suggests or supports loosening the truck-traffic limit. Under the circumstances, we hold that the grounds for a permit amendment were

not established and the court erred in changing that limit from where it was set by the 2004 ZBA.

## IV.

¶ 74. ██ We next address the issue of whether the environmental court erred in relying on one-hour average noise levels and failing to consider an increase in high-decibel noise events, or instantaneous peak noise levels. The environmental court's analysis with respect to this issue goes to whether the project will have an adverse aesthetic impact under Act 250 Criterion 8, which the former Environmental Board and this Court have held covers noise impacts. See *In re Chaves A250 Permit Reconsider*, 2014 VT 5, ¶¶ 23-24, 195 Vt. 467, 93 A.3d 69. An analysis of a project's aesthetic impacts under Criterion 8 begins with the two-part *Quechee* test formulated by the Environmental Board in *In re Quechee Lakes Corp.*, Nos. 3W0411-EB, 3W0439-EB, slip op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985), http://www.nrb.state.vt.us/lup/decisions.htm. Under the *Quechee* test, a project violates Criterion 8 if: (1) the proposed project will have an adverse aesthetic impact and (2) that impact will be undue. *In re Times & Seasons, LLC*, 2008 VT 7, ¶ 8, 183 Vt. 336, 950 A.2d 1189. An impact is undue if: (1) it "violate[s] a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area"; (2) it "offend[s] the sensibilities of the average person"; or (3) the applicant has "failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." *Id.*

¶ 75. We reiterate that our evaluation of this claim, as others, is limited by our standard of review. We defer to the environmental court's expertise in matters of land-use permitting and its conclusions on the impacts a proposed project will have on the environment. *In re Rte. 103 Quarry*, 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694. It is the role of the environmental court to weigh the evidence and assess the credibility of the witnesses with respect to these impacts, *In re McShinsky*, 153 Vt. 586, 589-90, 572 A.2d 916, 918-19 (1990), and we will uphold the court's conclusions so long as it has not abused its discretion. *In re Chaves*, 2014 VT 5, ¶ 30. The court's conclusions, however, must be supported by the factual findings. *Turnley v. Town of Vernon*, 2013 VT 42, ¶¶ 11-12, 194 Vt. 42, 71 A.3d 1246.

¶ 76. Before we analyze the environmental court's decision, we emphasize that the issue is limited only to noise from truck traffic

under Act 250. There is an apparent conflict between the 2004 ZBA permit condition with respect to noise from the project site and the permit condition imposed by the environmental court. The ZBA set a limit of 55 dB at the property line, which seemingly excludes noise from truck traffic outside the project site, while the environmental court set a limit of 70 dBA at the property line.[22] As we held in Part III, *supra*, ¶ 66, this conflict must be resolved by treating any higher noise limit as a zoning permit amendment that must meet the standard for such amendments. Neighbors have not raised this conflict in particular, and it is not the basis of this issue with respect to truck-traffic noise under Act 250.

¶ 77. The crux of the parties' dispute here is the use of two different noise measurements for assessing the traffic impacts under Criterion 8. The first measurement is the Lmax, which is the maximum noise level that will occur irrespective of its duration. *In re McLean Enters. Corp.*, No. 2S1147-1-EB, slip op. at 22 (Vt. Envtl. Bd. Nov. 24, 2004), http://www.nrb.state.vt.us/lup/decisions.htm. Simply put, Lmax measures instantaneous noise. *Id.* The second measurement is the Leq(n), which is the maximum noise level that will occur as averaged over a period of time (n). *Id.* Both the Lmax and Leq are measured in decibels (dB or dBA). Neighbors essentially argue that noise impacts under Criterion 8 should be evaluated under the Lmax standard for instantaneous noise, with particular concern about noise emitted from truck traffic along Hewitt Road. The environmental court instead applied the Leq standard, which neighbors claim was averaged over a period of one hour. Although the court never explicitly stated the duration of the Leq measurements, neighbors point out that the court used predicted noise levels drawn from the testimony of Lathrop's expert witnesses.

¶ 78. The environmental court recognized that former Act 250 decisions under Criterion 8 consistently have assessed noise impacts using the Lmax measurement, but the court relied on testimony from Lathrop's expert witnesses that the average Leq noise levels emitted by passing trucks, although discernible to residents, likely would not exceed the existing background levels. Specifically, the court found that Lathrop's haul trucks will emit noise at a level of 70 dBA (Leq) at the edge of the roadway and 56 dBA (Leq) at residences and outside areas of frequent human

---

[22] The dBA scale sets 0 dBA at the threshold for human hearing.

use, and that the average noise levels recorded at monitoring stations along nearby roads reported existing levels of 55-57 dBA (Leq). On that basis, the court concluded that the noise emitted from the truck traffic would not be undue, thereby satisfying Criterion 8.[23] The court made no findings as to the Lmax and did not consider Lmax measurements in reaching its conclusion.

¶ 79. Neighbors do not contest the court's findings with respect to the existing traffic and background noise levels, the average and maximum traffic that may be generated by the project, or the potential increase in decibel levels emitted by the additional traffic. Rather, neighbors dispute the environmental court's conclusion that the traffic generated by Lathrop's project will not emit noise that will create an undue adverse impact on neighbors and the surrounding area. Specifically, neighbors argue that the undue adverse impact will be created by the higher frequency of peak noise levels, especially during times that existing traffic is low, notably during the project's operating season, and during the warm season when windows and doors are open and people spend more time outdoors.

¶ 80. ■■■ As the environmental court acknowledged, the Environmental Board formulated a standard for determining at what point a noise event is adverse: where the noise exceeds 70 dBA (Lmax) at the property line and 55 dBA (Lmax) at surrounding residences and outside areas of frequent human use. *In re Barre Granite Quarries, LLC*, No. 7C1079 (Revised)-EB, slip op. at 80 (Vt. Envtl. Bd. Dec. 8, 2000), http://www.nrb.state.vt.us/lup/decisions.htm. This standard has guided Act 250 determinations over the past decade, and we recognized the standard in *Chaves*, 2014 VT 5, ¶ 31 n.4.

¶ 81. Although the environmental court recognized this standard, it emphasized that the standard should not be applied rigidly. The court cited *McLean Enterprises*, No. 2S1147-1-EB, in which the Environmental Board acknowledged that the context and setting of a project should aid in dictating the appropriate noise levels.

---

[23] We note that the environmental court's conclusion was based in part on the frequency of loaded trucks leaving Lathrop's property and the project's operational season as it relates to the operational season of Lathrop Forest Products, the wood pellet plant located across South Street. Assuming the number of truck trips per day was even further limited by the condition imposed by the 2004 ZBA order, there would be less noise.

*Id.* at 64. As the Board stated, "a 50 dBA Lmax standard may not make sense in noisy areas . . . . It may be of questionable logic and practically impossible to enforce a 50 dBA Lmax when trucks passing by . . . already register 78 dBA at an adjacent residence." *Id.*

¶ 82. We endorsed this flexibility in *Chaves*, 2014 VT 5, where we reviewed a claim quite similar to the one at issue here. The project neighbors in *Chaves*, who owned a country inn located across the highway from the quarry entrance, claimed that the environmental court erred in concluding that a proposed sand and gravel quarry satisfied Criterion 8 because the noise resulting from the truck traffic would exceed the maximum 55 dBA level established under *Barre Granite*. We disagreed with the neighbors' claim, even though the applicant's expert witness conceded that trucks accelerating past the neighbors' inn would produce sounds up to 69 dBA, and stated that "[t]his statement does not undermine the court's overall finding that noise levels would generally remain under 55 dBA and that the noise was not adverse to the area's aesthetics." *In re Chaves*, 2014 VT 5, ¶ 33. We also noted that the noise expert explained that the existing truck traffic already emitted noise up to 68 dBA and that the 1 dBA difference is insignificant. *Id.* We concluded:

> From this evidence, the court found that in those instances where the noise exceeded the 55 dBA standard, the Project noises will be no louder than the discernible noises from the Route 100 traffic and activities on surrounding properties. Essentially, even though applicants' experts testified that in some instances the noise from trucks leaving the quarry could exceed 55 dBA, the character of the area already included significant traffic noise at or near the level of those exceedances and therefore a slight increase in the traffic noise would not amount to an adverse impact.

*Id.* (quotation omitted). The neighbors in *Chaves* also argued that the court erred in looking at the average rather than the maximum number of trips that may be generated by the proposed project. We again disagreed with the neighbors and stated that the court considered both the average and maximum "but credited applicants' expert that if this level of operation were maintained, the project would operate on only forty-eight days, given the limit

on extraction . . . [and] that it was more likely that extraction and traffic would be spread across an operating season." *Id.* ¶ 28.

¶ 83. Lathrop argues that the *Chaves* decision controls and decides the issue here. We do find *Chaves* helpful in creating the parameters within which the environmental court can exercise its discretion, but we ultimately conclude that it is distinguishable and thus not controlling here. First, while the environmental court in both *Chaves* and in this case considered the preexisting overall background averages and concluded that the noise emitted by the truck traffic would remain within those averages, the court in *Chaves* conducted a more thorough analysis, looking at not only the overall averages but also the Lmax, as required under the *Barre Granite* standard. The *Chaves* court made findings as to the Lmax and concluded that the 1 dBA increase over the maximum existing noise from passing traffic would not be adverse in the context of the industrial setting. Here, the environmental court made no findings as to the Lmax, considering only the Leq, despite testimony from Lathrop's noise expert that the instantaneous noise emitted by passing traffic would exceed the 70 dBA Lmax standard.

¶ 84. Second, *Chaves* dealt with preexisting traffic on a major road, and there is no indication in the opinion that there was seasonal variation in traffic volume or noise. The court there considered the increase in traffic generated by the quarry and the noise experts' testimony that the additional trips would increase the noise level by less than 3 dB. In this case, the trucks travel along secondary roads — South Street and Hewitt Road — and primarily during a different operational season from the preexisting truck traffic generated by Lathrop Forest Products. From this, the environmental court concluded that the truck traffic would "mesh conveniently" with the existing traffic and not increase the overall average noise levels, even though neighbors complain that the adverse impact is created by the increased frequency of peak noises on a year-round basis. Cf. *John A. Russell Corp.*, 2003 VT 93, ¶ 33 (stating that environmental court erred in failing to consider increase in frequency of loud noises emitted by proposed asphalt plant even though plant would not emit noise in excess of preexisting decibel levels).

¶ 85. While the *Barre Granite* standard indeed is applied flexibly to accommodate existing background noise and the project context, the Environmental Board consistently adhered to Lmax

calculations when assessing the adverse impact of noise. See, e.g., *McLean Enters. Corp.*, No. 2S1147-1-EB, at 65. The environmental court explicitly relied on *McLean Enterprises* and its discussion of the need for flexibility, quoting the Board's statement that a permit condition of 50 dBA Lmax would be inappropriate "in a quiet rural residential area with background noises under 30 dBA L90" and that "[i]t may be of questionable logic and practically impossible to enforce a 50 dBA Lmax when trucks passing by . . . already register 78 dBA at an adjacent residence." *Id.* at 64. We agree that the reliance on *McLean Enterprises* was appropriate, see 10 V.S.A. § 8504(m) (stating that in Act 250 appeals, prior decisions of Environmental Board "shall be given the same weight and consideration as prior decisions of the Environmental Division"), but the court failed to apply the full holding of *McLean Enterprises*. The Board in *McLean Enterprises* rejected the applicant's argument that the Board should use the Leq standard, rather than the Lmax standard, in imposing permit conditions and emphasized that although "the time period of 1 second for an Leq theoretically would result in readings similar to a Lmax. . . . the Board has historically used Lmax." *McLean Enters. Corp.*, No. 2S1147-1-EB, at 65.

¶ 86. As evidenced by the transcript, the environmental court wrestled with the application of the Lmax standard to highway traffic, concluding that "if we were obligated to apply the 55 dB or 75 dBA noise-level standards to traffic as it crossed the border . . . there would be no large development that would receive a permit in the State of Vermont." While our decision in *Chaves* had not been issued when the environmental court made its decision, several Environmental Board decisions have applied the Lmax instantaneous noise level standards to truck traffic. In *In re Casella Waste Management, Inc.*, No. 8B0301-7-WFP (Waste Facility Panel May 16, 2000), http://www.nrb.state.vt.us/lup/deci sions.htm, the Waste Facility Panel of the Environmental Board found that "[i]nstantaneous sound levels (in relation to background noise) are the appropriate standard (as opposed to average levels over time) by which to judge noise impacts from trucks, as that is what impacts on the human ear from truck traffic" and that "[m]aximum sound (peak level) readings are a better indicator than average sound readings for determining the impacts of instantaneous noise from trucks." *Id.* at 22. The Panel further stated that "[w]hen evaluating the real effect on people

from the noise of passing trucks, *it is more appropriate to consider the instantaneous noise from the trucks as they pass because that is what people experience."* *Id.* at 34 (quoting *In re OMYA, Inc.*, No. 9A0107-2-EB, slip op. at 15 (Vt. Envtl. Bd. May 25, 1999), http://www.nrb.state.vt.us/lup/decisions.htm). The Board in *OMYA* similarly rejected average noise levels for truck traffic, emphasizing that "[w]hile the average noise levels may not increase significantly with OMYA's proposed additional truck traffic, each additional instance of a truck passing results in an additional instantaneous loud noise, or an additional annoyance that interferes with sleep and conversations." *In re OMYA, Inc.*, No. 9A0107-2-EB, slip op. at 15. And in *In re Bickford*, No. 5W1186-EB, slip op. (Vt. Envtl. Bd. May 22, 1995), http://www.nrb.state.vt.us/lup/decisions.htm, the Board found the traffic noise adverse, citing the 55 dBA standard for outside areas of frequent human use, because the haul trucks from the project site when passing the adjacent motel cabins would emit peak noises of 85-95 dBA, a "high increase" over the existing 42-50 dBA "no traffic" background levels. *Id.* at 33.

¶ 87. In general, the Environmental Board decisions reflect a more thorough analysis of the changes in traffic patterns and the attendant noise emissions than the environmental court decision before us. This analysis is demonstrated in *OMYA*, No. 9A0107-2-EB, where the Board considered the large increases in high-decibel noise events in relation to the existing traffic passing through a downtown. *Id.* at 37-38; see also *Bickford*, No. 5W1186-EB, slip op. at 33 (concluding that, although tourist cabins already experience traffic from state highway, increase in instantaneous traffic noise during periods of no traffic on highway would be adverse). Our discussion of noise impacts in *John A. Russell Corp.*, 2003 VT 93, although in the context of a municipal permit, also points to a more complete analysis. There, the environmental court concluded that the noise emitted by the asphalt plant, which was added to an existing quarry, would not adversely affect the character of the area because it would be no louder than the noise limits under the quarry's Act 250 permit. *Id.* ¶ 32. We held that the court failed to conduct a complete analysis because even though the court found the asphalt plant would not emit noise in excess of the decibel levels set by the preexisting permits, it "did not evaluate the neighbors' complaint that the frequency of loud noise would increase and affect the use and enjoyment of nearby residences." *Id.* ¶ 33.

¶ 88. ■■■ We therefore conclude that the environmental court erred in not making findings on the Lmax instantaneous noise levels emitted by the project traffic and failing to consider the increase in frequency of high-decibel noise events during the project's operational season in assessing the project's compliance with Criterion 8. On remand, the court should assess the evidence with respect to high Lmax events and make findings with respect to the evidence. Based on those findings, it should determine whether the frequency and amount of these events and intensity complies with Criterion 8.

## V.

¶ 89. We next address the issue of whether the environmental court erred in admitting and relying on the acoustical-modeling testimony under Vermont Rule of Evidence 702 and the *Daubert* standard for admissibility. Lathrop's expert witness testified to the noise impacts on surrounding landowners from the site's operations. In doing so, the witness relied upon acoustical modeling produced by the computer software CADNA-A. Neighbors moved to exclude the testimony because the software's limitations make it inapplicable to the type of rugged terrain on Lathrop's parcel. Neighbors point to the International Organization for Standardization's method for calculating ground attenuation, which is implemented by CADNA-A, and its caveat that the method "is applicable only to ground which is approximately flat, either horizontally or with a constant slope." The environmental court rejected neighbors' assertion, finding credible the noise expert's testimony that the program took into account the topography and other acoustical mitigating factors. We need not resolve the issue of the software's limitations. We conclude that the environmental court did not err in admitting and relying on the CADNA-A acoustical-modeling testimony because, regardless of the limitations of the software, the testimony is relevant under Rule 702 and *Daubert*.

¶ 90. The environmental court's decision to admit or exclude evidence is "highly discretionary" and will be reversed "only where discretion has been abused or withheld and prejudice has resulted." *Griffis v. Cedar Hill Health Care Corp.*, 2008 VT 125, ¶ 18, 185 Vt. 74, 967 A.2d 1141. Nonetheless, with respect to the admissibility of evidence under Rule 702 and the *Daubert* factors, we must "engage in a substantial and thorough analysis of the

trial court's decision and order to ensure that the trial judge's decision was in accordance with *Daubert* and our applicable precedents." *Lasek v. Vt. Vapor, Inc.*, 2014 VT 33, ¶ 9, 196 Vt. 243, 95 A.3d 447 (quotation omitted). We are also mindful that this is a bench trial and that although the *Daubert* standard is applicable, "a judge in a bench trial should have discretion to admit questionable technical evidence," although the judge "must not give it more weight than it deserves." *USGen New Eng., Inc. v. Town of Rockingham*, 2004 VT 90, ¶ 26, 177 Vt. 193, 862 A.2d 269 (quotation omitted).

¶ 91. Vermont Rule of Evidence 702 allows admission of scientific or technical knowledge if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 further states that

> a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Our Rule 702 closely follows the federal rule, which was delineated in *Daubert*, 509 U.S. 579. The *Daubert* factors have become the preeminent standard for admissibility of expert testimony and were adopted by this Court in *State v. Brooks*, 162 Vt. 26, 30, 643 A.2d 226, 229 (1993). The *Daubert* standard requires that judges act as gatekeepers of expert testimony, admitting it only if it is both reliable and relevant. *State v. Scott*, 2013 VT 103, ¶ 9, 195 Vt. 330, 88 A.3d 1173.

¶ 92. Neighbors do not dispute the reliability of the CADNA-A acoustical-modeling software, nor do neighbors dispute the relevancy of acoustical modeling generally in assessing the noise impacts of the project: indeed this goes directly to one of the major issues. Rather, neighbors contest the reliability of the evidence as it applies specifically to the rugged terrain of Lathrop's parcel — in essence, they argue that the evidence does not "fit" the facts of the case. The United States Supreme Court discussed fit in *Daubert* as an issue of relevancy, stating that the expert testimony must be " 'sufficiently tied to the facts of the case that it will aid the [fact finder] in resolving a factual

dispute.' " 509 U.S. at 591 (quoting *United State v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). The Supreme Court further noted that fit "is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

¶ 93. The relevancy of the CADNA-A testimony as applicable to the facts here is controlled by *State v. Scott*, 2013 VT 103, which was issued on the same day as the environmental court's decision. In *Scott*, the defendant was charged with grossly negligent operation of a motor vehicle, with death resulting, because of an accident in which the defendant's vehicle went through a stop sign and collided with another vehicle. The prosecution offered the testimony of an accident-reconstruction expert who testified to the impact speed of the defendant's vehicle. The expert's calculations were derived in part from on-site testing that involved pulling a drag sled over the road surface and onto the grass where the vehicles had traveled. The defendant moved to exclude the testimony as unreliable, citing expert analysis, including that of the American Prosecutor's Research Institute, that the drag sled could not be used on grass. The expert witness testified that his techniques were nationally accepted within his field and consistent with his training, and he added that, while using the sled on grass "was not ideal, . . . it was the best technique available." *Id.* ¶ 13.

¶ 94. We affirmed the superior court's admission of the evidence, ruling that the general understanding that the drag sled should not be used on grass went to weight of the evidence and not admissibility. *Id.* ¶ 14. While we acknowledged that accuracy of the drag sled's use on grass was "lacking," we concluded that "[t]his alone . . . does not transform [its use on grass to] 'junk science' to be categorically excluded under Rule 702." *Id.* Rather, we found that the use "qualifies as a well-reasoned but novel application of a traditionally accepted technique" and emphasized that the defendant had ample opportunity to explore the proper weight of this evidence through cross-examination of the expert witness. *Id.* We think that holding is equally applicable here.

¶ 95. We are cognizant of the split in the federal courts over whether the necessary "fit" under *Daubert* requires more than relevancy under Federal Rule of Evidence 401. See D. Herr, Annotated Manual for Complex Litigation § 23.25 (4th ed. 2014). In essence *Scott* provides a holding that bare relevancy or something akin to bare relevancy is sufficient for evidence to meet

the fitness requirement. While we had not addressed the issue explicitly before *Scott*, our prior decisions were entirely consistent with its holding. See *Estate of George v. Vt. League of Cities & Towns*, 2010 VT 1, ¶ 71, 187 Vt. 229, 993 A.2d 367 (applying Vermont Rule of Evidence 401 in *Daubert* context); *State v. Brochu*, 2008 VT 21, ¶ 49, 183 Vt. 269, 949 A.2d 1035 (same); see also *State v. Burgess*, 2010 VT 64, ¶¶ 12, 15, 188 Vt. 235, 5 A.3d 911 (stating that deficiencies in expert testimony should be attacked through cross-examination and presentation of contrary evidence); *In re JAM Golf, LLC*, 2008 VT 110, ¶ 9, 185 Vt. 201, 969 A.2d 47 (same).

¶ 96. Turning to the expert testimony here, the relevancy analysis is not whether the acoustical modeling will help the trier of fact determine the impact of noise on neighbors, but whether evidence of acoustical modeling with a program limited to flat terrain will help the trier of fact determine noise impacts of a project on rugged terrain. Lathrop's expert witness testified that the CADNA-A predictions would be of assistance to the court. Furthermore, one could argue that noise levels predicted for flat terrain would be too high when applied to rugged terrain because berms, hills, and other geographical features may absorb and temper the sound; this certainly would help neighbors' case. In any event, while the alleged disconnect between the computer software and the facts here may render the testimony deficient, it is the province of the court to then weigh the credibility of that evidence. Neighbors had the opportunity to cross-examine Lathrop's noise expert and present contrary evidence, and the environmental court aptly considered both, ultimately finding Lathrop's evidence more credible.

¶ 97. Finally, we note that it was reasonable for the court to find the testimony of Lathrop's noise expert that the computer software takes into account the geography of the terrain credible, even in light of neighbors' claim that the software is limited in application, and to rely on the acoustical-modeling testimony in drawing its conclusions on the noise impacts to neighbors. Beyond that, it is not our role to second-guess the court's evidentiary rulings. *Rutland Herald v. City of Rutland*, 2012 VT 26, ¶ 41, 191 Vt. 387, 48 A.3d 568 (stating that it is exclusive role of trial court to weigh evidence).

¶ 98. ██ We therefore conclude that the environmental court did not err in admitting and relying on the acoustical-modeling testimony of Lathrop's noise expert.[24]

## VI.

¶ 99. Finally, we turn to the issue of whether the environmental court was required to remand the Act 250 application to the district commission to consider project changes including the changed access point from Rounds Road back to South Street. Neighbors and amicus Vermont Natural Resources Board (NRB) argue that the changed access point in particular substantially altered the project, requiring remand to the district commission to give notice to affected parties and consider the impacts. The NRB additionally argues that the court's failure to remand contradicts the Act 250 statute and rules and sets a precedent that diminishes the role of the district commission in Act 250 proceedings. In opposing a remand, Lathrop primarily relies on our decision in *Chaves*, 2014 VT 5, ¶¶ 13-14, where we held that the changed access point for the sand and gravel operation did not require a remand, and argues that we should apply its holding here. Our standard of review for the environmental court's decision to remand a permit application is abuse of discretion. *In re Maple Tree Place*, 156 Vt. 494, 501, 594 A.2d 404, 408 (1991).

¶ 100. We start with *Chaves*, 2014 VT 5, our most recent Act 250 decision to address this issue and a focal point of the parties' arguments. In *Chaves*, we held that the site plan changes — which involved changing the access point from a proposed new entrance to an existing access road; changing the loading area and a related berm for noise mitigation; adding noise mitigation berms; limiting maximum daily truck trips; and restricting the days and hours for blasting, drilling, and crushing — were not substantial enough to require a remand. *Id.* ¶¶ 13-14. We relied on *In re Sisters & Brothers Investment Group, LLC*, 2009 VT 58, 186 Vt. 103, 978 A.2d 448, a local zoning decision in which we held

---

[24] Because we conclude that the court did not err in admitting the evidence under *Daubert* and Rule 702, we do not reach neighbors' argument that the court erred in admitting the evidence under Vermont Rule for Environmental Court Proceedings 2(e)(1), which allows evidence not privileged and otherwise inadmissible under the Rules of Evidence to be admitted at the discretion of the court "if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs."

that the environmental court may review revisions to a proposal so long as those revisions are not "truly substantial changes to the form or type of an application." *Id.* ¶ 21. In *Sisters & Brothers*, we cautioned against the "procedural ping-pong match" that would ensue between the environmental court and municipal board if applicants were barred from presenting minor revisions to the court. *Id.* We further stated in *Chaves* that we should encourage applicants to resolve differences with interested parties by amending proposals to respond to issues and that it would be inefficient to remand all changes to the district commission. 2014 VT 5, ¶ 16.

¶ 101. Neighbors and the NRB argue that this case is distinguishable from *Chaves* because the impacts of the changed access point here are more significant than in *Chaves*. The NRB also asks that we clarify our holding in *Chaves* and limit the reach of that case "in a fashion that preserves the legislatively-intended, important role of the District Commission and does not deprive neighbors and other interested parties of the opportunity to participate in the Act 250 process." The fact in *Chaves* that neighbors and the NRB highlight as distinguishable is that the amended access point was a preexisting historically used road, while the South Street access point here will require construction of the access road and physical improvements along South Street. We did emphasize in *Chaves* that the fact that "the changed entry point may now impact neighbors more particularly does not amount to a substantial change in the project itself." *Id.* ¶ 15. We also noted that this and other project changes were attempts to mitigate noise and traffic impacts and limit the time for operations. *Id.* ¶ 14. Our decision there largely was based on the fact that the neighbors had been a party to the settlement agreement in which the changed access point was proposed, that the neighbors had prior knowledge of the proposal, and that the neighbors were aware of the existing access point, which had been actively used during excavation following Hurricane Irene. *Id.* ¶ 20. In this sense, Lathrop's proposal is distinguishable from the facts of *Chaves*. But our analysis does not end there. We must still determine the reach of *Chaves*, and its applicability here.

¶ 102. The rule that we formulated in *Chaves*, as derived from our consideration in *Sisters & Brothers*, states that a remand is not necessary unless there are changes in the scope of the project, the location of the project, or the nature of the permit. *Chaves*, 2014 VT 5, ¶ 14. We likened the changes made by the

applicants in *Chaves* to those in *Sisters & Brothers* for our conclusion that they were insubstantial. Turning to *Sisters & Brothers*, it is unclear just what changes were made to the application. The recitation of background facts contains no such itemization of changes. Rather, the discussion of this issue merely provides: "[The neighbor's] contention that the changes were material and substantial is directly contrary to the Environmental Court's finding on this point. The court expressly found that the changes were *not* so material as to require remand . . . ." 2009 VT 58, ¶ 19. This rule, although a helpful starting point, does not delineate just what it means when the "scope" of the project changes. We recently returned to this issue in the context of local zoning in *In re All Metals Recycling, Inc.*, 2014 VT 101, 197 Vt. 481, 107 A.3d 895, where we addressed a revised parking plan submitted to the environmental court that had not been presented to the local development review board. We again looked to *Chaves* and *Sisters & Brothers* to hold that the revised parking plan was not a substantial enough change to warrant a remand. *Id.* ¶¶ 19-20. We concluded that the revised plan differed little from the original, except to superimpose lines denoting specific parking spaces and to label the number of available spots. *Id.* ¶ 20. While this conclusion helps us little, we are guided somewhat by our statement that the court's review is limited to those matters that have undergone proper public notice and hearing before the local board. *Id.* ¶ 19.

¶ 103. These cases present the lower limit of the environmental court's discretion not to remand but provide little guidance on the upper limit. Because our prior case law is not particularly decisive in this area, we also consider the role of the district commission and the policy behind the remand requirement. It is the role of the district commission to adjudicate Act 250 permit applications under the ten criteria. 10 V.S.A. §§ 6083(a), 6086. The Act 250 process also guarantees public notice and the opportunity for interested parties to participate and present evidence on the criteria. *Id.* §§ 6084, 6085. Furthermore, the Act 250 Rules have codified the former Environmental Board's consistent practice of requiring new notice of project changes. Rule 10(H) provides:

> If, in the course of reviewing an application, the district commission determines that a project has changed from the project that has been noticed to the extent that such change may have a significant adverse

impact under any of the criteria or may affect any person under any criteria, the commission shall stay the proceedings and provide new notice of the changed project, pursuant to this rule.

Act 250 Rule 10(H), 6 Code of Vt. Rules 12 004 060-7, http://www.lexisnexis.com/hottopics/codeofvtrules. The Board further has held that remand to the district commission is necessary when a project change may impact new criteria or affect new parties. See, e.g., *In re Osgood*, No. 7E0709-3-EB, slip op. at 2 (Vt. Envtl. Bd. Nov. 26, 2002), http://www.nrb.state.vt.us/lup/decisions.htm (stating that application must be returned to commission if amendment involves construction on new lands, creates impacts on new parties, or creates impacts to criteria not at issue before Board); *In re Colton*, No. 3W0405-5(Revised)-EB, slip op. at 3 (Vt. Envtl. Bd. Oct. 2, 2002), http://www.nrb.state.vt.us/lup/decisions.htm (requiring remand to assess impacts from trucks using new driveway and changing direction they turn from project tract onto state highway).

¶ 104. While the environmental court reviews appeals from the district commission de novo, its authority is no larger than that of the district commission and it cannot consider issues not presented to the commission, cf. *Maple Tree Place*, 156 Vt. at 500, 594 A.2d at 407 (emphasizing that environmental court "must resist the impulse to view itself as a super planning commission" and therefore must not address issues "never presented to the planning commission and on which interested persons have not spoken" (quotation omitted)), particularly Act 250 criteria. Cf. *In re Taft Corners Assocs.*, 160 Vt. 583, 591, 632 A.2d 649, 653 (1993) (stating that Environmental Board's jurisdiction is limited by proceedings below and does not extend to new criteria never considered by district commission). This rationale is supported by our case law that acknowledges the particular expertise of administrative bodies in adjudicating the issues before it. See, e.g., *In re Stormwater NPDES Petition*, 2006 VT 91, ¶ 30, 180 Vt. 261, 910 A.2d 824 (recognizing expertise of Agency of Natural Resources in issuing stormwater permits); *In re Investigation into Regulation of Voice Over Internet Protocol (VoIP) Servs.*, 2013 VT 23, ¶ 32, 193 Vt. 439, 70 A.3d 997 (recognizing expertise of Public Service Board in assessing digital voice services).

¶ 105. With this background in mind, we turn to the revisions here. The original project as presented to the district commission

involved construction of a haul road off of Rounds Road and included an alternative South Street access road to be constructed in the future, but that application was considered only under Criterion 10. The application as presented to the district commission in 2010 for full consideration under the remaining criteria included only the construction of a 300-lineal-foot haul road off of Rounds Road and made no mention of the possibility of a future South Street access point.

¶ 106. As the environmental court found, the South Street access road construction, including all work on the surrounding area and improvements to South Street, will take one year to complete. Construction will begin with clearing and slope stabilization work, which will involve the rehabilitation of the preexisting extraction area. This extraction area will then be graded and sculpted to create a level area for vehicles entering and exiting the project site. The exposed sand and gravel will be covered with top soil, seeded, and mulched, and the natural ground cover will be reestablished. The access road will be paved from South Street to just past the highest point of the access road. As excavation progresses, the access road will be realigned to accommodate excavation. Lathrop submitted an erosion prevention and sedimentation control plan for the access road construction. South Street itself will be widened to improve travel lanes and add shoulders. The court also found that while the work will occur outside the buffers of the project area, resulting in more noise impacts to neighbors, the work will be short and temporary in duration.

¶ 107. There is no indication that the access point was changed to address substantial criticism of the Rounds Road proposal, and the revisions clearly are more substantial than those discussed in *Chaves* and *All Metals Recycling.* Here, the South Street access point is not using a preexisting road, and the parties potentially impacted by the improvements were not necessarily involved in the case before the environmental court and thus had no opportunity to comment. Because construction is involved in a new location — construction that involves earthmoving and reshaping the land, equipment that may produce noise or dust, and possible future realignment — there may be impacts on Act 250 criteria that were not reviewed by the district commission. The environmental court reviewed the project only with respect to the limited criteria appealed from below: aesthetics, traffic, impacts on public investments, impacts from pit operations, and consistency with the

town and regional plans. The court never considered the new criteria that may be impacted by this construction and the ensuing changes in traffic patterns.

¶ 108. Lathrop urges that remand is unnecessary because neither the district commission nor any interested parties have alleged that the Rounds Road access point is preferable. But Lathrop's argument misses the point of the district commission's role. First, without a full review of the access road improvements, the district commission cannot make a full assessment as to its impacts and therefore cannot opine on whether the South Street access point is an improvement over the Rounds Road access point. Second, the role of the district commission is not just to select which alternative plans are the most preferable. The district commission also is responsible for assessing the impacts of the project and conditioning them as necessary.

¶ 109. ██ ██ While we still promote the need for efficiency in the permitting process, as discussed in *Chaves*, we decline to extend *Chaves* to project revisions that may implicate new criteria not before the environmental court or affect new parties not participating in the proceedings. Truly minor revisions of the type addressed in *Chaves* and *All Metals Recycling*, specifically the type of revisions that mitigate impacts in response to the concerns of interested parties, may still remain within the discretion of the court and do not require remand. But requiring remand for larger changes of the type here preserves the role of the district commission and ensures interested parties have the opportunity to comment and present evidence on the new impacts.

¶ 110. We therefore conclude that the environmental court erred in failing to remand the application to the district commission to assess the impacts from the revised South Street access point.

*Affirmed with respect to sand and gravel extraction operations as a conditional use in the RA-2 and MIX districts and the admissibility of the acoustical-modeling testimony. Reversed and remanded with respect to compliance with § 526(2) of the Town of Bristol zoning bylaws for proceedings consistent with this decision. Reversed and remanded to determine whether the proposal approved by the environmental court represented a substantial change from the proposal approved by the ZBA in 2004 and to determine the preclusive effect of the 2004 ZBA permit conditions. Reversed and remanded to determine the impact of truck traffic*

*noise under Act 250 Criterion 8 consistent with this decision. The environmental court shall remand the Act 250 permit application to the district commission for consideration of the project as presented to the environmental court.*

## Appendix

| Lathrop I: Proposed to ZBA in 2003 (as amended in 2004) | Lathrop I: Conditioned by ZBA in 2004 | Lathrop II: Proposed to ZBA in 2007 and to District Commission in 2010 | Lathrop III: Proposed to Environmental Division in 2012 Appeal | Conditioned by the Environmental Court in 2013 |
|---|---|---|---|---|
| 60,000 cubic yds/yr | Max 60,000 cubic yds/yr | 60,000 first 15 years; 100,000/year thereafter | Lathrop II | Max 60,000 cubic yards/yr unless and until authorized by both the district commission and the ZBA |
| 17 daily truckloads | 17 daily truckloads on average; max 34 trucks per day | 36 daily truckloads on average; max 72 trucks per day | Lathrop II | Max 100 one-way truck trips per day unless and until authorized by the district commission and ZBA (50 truckloads) |
| South Street access road | Access road paved to beyond crest; 25 feet wide min, not including ditches; runaway ramp at base | Rounds Road access road | South Street access road; 22 feet wide minimum access road; no runaway ramp | |

| Lathrop I: Proposed to ZBA in 2003 (as amended in 2004) | Lathrop I: Conditioned by ZBA in 2004 | Lathrop II: Proposed to ZBA in 2007 and to District Commission in 2010 | Lathrop III: Proposed to Environmental Division in 2012 Appeal | Conditioned by the Environmental Court in 2013 |
|---|---|---|---|---|
| Mature trees within 200 feet of roads and property lines will be maintained around perimeter of site | | SAME | SAME | |
| Trees more than 200 feet from roads and property lines will be maintained until removal is necessary for extraction | | SAME | SAME | |
| Mature maple trees will be maintained to buffer properties to the north | | SAME | SAME | |
| Staggered line of softwoods will be planted on north side of property for further screening | Rows of evergreens planted at the 570-foot elevation at the north end of the property; at least three rows; quick growing, dense, last for at least 50 years | SAME but with more detail: 4-5 feet high, staggered, 188 trees minimum, lists specific tree options | Lathrop II | |

| Lathrop I: Proposed to ZBA in 2003 (as amended in 2004) | Lathrop I: Conditioned by ZBA in 2004 | Lathrop II: Proposed to ZBA in 2007 and to District Commission in 2010 | Lathrop III: Proposed to Environmental Division in 2012 Appeal | Conditioned by the Environmental Court in 2013 |
|---|---|---|---|---|
| 1/2 vegetated slopes with flat interior pit floor and buffer of vegetation will remain when extraction is complete | Must leave no slope steeper than 1/2; all slopes in excess shall be fenced | SAME | Remove part of South Street berm along north side of project as part of reclamation plan | Revise to include plans to remove portion of berm |
| Reclamation will be ongoing, creating 1/2 slopes reclaimed with vegetation moving top to bottom and south to north | Excavated area shall be fertilized, mulched, and reseeded; no more than 2 acres unclaimed at any time; average rate of 1 acre per year; top down finish | Maximum 5 acres disturbed at any time | Lathrop II | |
| All surface drainage kept within confines of pit or excavated area | All surface drainage shall be controlled | SAME | SAME | |
| | No excavation, blasting, or stockpiling within 200 feet of road or other property line | SAME | SAME | |

| Lathrop I: Proposed to ZBA in 2003 (as amended in 2004) | Lathrop I: Conditioned by ZBA in 2004 | Lathrop II: Proposed to ZBA in 2007 and to District Commission in 2010 | Lathrop III: Proposed to Environmental Division in 2012 Appeal | Conditioned by the Environmental Court in 2013 |
|---|---|---|---|---|
| | No power-activated sorting machinery located within 300 feet of road or property line and must be equipped with dust-elimination devices | Not specified | Not specified | |
| | Hours of operation:<br>• 7:30-3:00 M-F (all pit ops)<br>• 7:30-12:00 S (loading only)<br>• 8:00-3:00 M-F (blasting; 3 days/year)<br>• Crushing limited to 20 days/year in May and September only | Hours of operation:<br>• 7:00-4:30 M-F; 7:00-3:30 S (site development)<br>• 6:30-4:30 M-F; 7:00-3:30 (general ops)<br>• 7:00-3:30 M-F; 7:30-12:00 S (sales)<br>• Blasting: no change<br>• Crushing: no limit on May and September | Lathrop II | |
| | All trucks covered | SAME | SAME | |
| | All trucks over 2 cubic yard capacity must receive sticker | Not specified | SAME | |

| Lathrop I: Proposed to ZBA in 2003 (as amended in 2004) | Lathrop I: Conditioned by ZBA in 2004 | Lathrop II: Proposed to ZBA in 2007 and to District Commission in 2010 | Lathrop III: Proposed to Environmental Division in 2012 Appeal | Conditioned by the Environmental Court in 2013 |
|---|---|---|---|---|
| | Truck size, max 14 cubic yard dual axle and 19 cubic yard tri-axle; no trailers | Not specified | No limit on truck size or tractor trailers, except general legal limits | |
| | Blasting mitigation<br>• Granular stemming<br>• Boulders buried<br>• Avoid detonating cord<br>• Seismographs to measure air blast overpressure<br>• Notification posted at entrance at least 7 days in advance | SAME | N/A — no blasting proposed | |
| | Crushing mitigation:<br>• Operated inside pit<br>• Noisiest part directed away from residences | SAME | SAME | |

| Lathrop I: Proposed to ZBA in 2003 (as amended in 2004) | Lathrop I: Conditioned by ZBA in 2004 | Lathrop II: Proposed to ZBA in 2007 and to District Commission in 2010 | Lathrop III: Proposed to Environmental Division in 2012 Appeal | Conditioned by the Environmental Court in 2013 |
|---|---|---|---|---|
| | Noise & dust mitigation:<br>• No drilling earlier than one hour after sunrise<br>• European-grade mufflers and other sound-control devices on all equipment<br>• Backup alarm noise reduced<br>• Trucks should not back up before loading<br>• Screening deck inside pit; loudest side facing away from neighbors<br>• Quarry site vegetated as much as possible<br>• On-site water truck for dust control<br>• Overburden used to create berms around perimeter of pit close to residential areas<br>• No off-site emissions visible<br>• Key lot and access road oriented to minimize noise | SAME | SAME, except no specific requirement for "European-grade" mufflers | Noise mitigation shall be revised to include European-grade mufflers and prohibit engine compression or "jake" breaks |

| Lathrop I: Proposed to ZBA in 2003 (as amended in 2004) | Lathrop I: Conditioned by ZBA in 2004 | Lathrop II: Proposed to ZBA in 2007 and to District Commission in 2010 | Lathrop III: Proposed to Environmental Division in 2012 Appeal | Conditioned by the Environmental Court in 2013 |
|---|---|---|---|---|
| | Noise shall not exceed 55 db at property line; if it does, additional mitigation necessary | Noise from operational sources (excluding on-road trucks and blasts) limited to 55 db at all homes and areas of frequent human use | Noise shall not exceed 55 at residences and areas of frequent human use and 70 at property line; no noise limit on truck traffic or construction activities | |
| | All materials and inventory stored in pit | SAME | Not specified | |
| | All excavation, except access road, will stay in wooded area for 15 years | SAME | SAME | |
| | No gravel imported from other sites | Not specified | Not specified | |
| | Annual geologist's report and truck log | Not specified | Annual report — not necessarily from geologist | |
| | No processing in the MIX zone; gravel used to construct roads and berms within project site | SAME | See berm comment above | |